402 P.2d 1

**STATE of Arizona, Appellee,**

**v.**

**Warren Carl SHERRICK, Appellant.**

**No. 1325.**

Supreme Court of Arizona.

En Banc.

May 14, 1965.

Rehearing Denied July 6, 1965.

Darrell F. Smith, Atty. Gen., Robert F. Pickrell, former Atty. Gen., Philip M. Haggerty, Asst. Atty. Gen., Charles N. Ronan, former County Atty., Maricopa County, for appellee.

Robert K. Corbin, Phoenix, for appellant, on appeal only.

UDALL, Justice.

This is an appeal by Warren Carl Sherrick from his conviction of first degree murder for which the death penalty was assessed.

The victim of this homicide was a bar owner whose body was discovered lying face down on the floor of the back room of

his bar at 4:30 A. M., May 24, 1962, by his brother-in-law, James Felling. The victim had been shot twice in the back of the head. All the currency had been removed from the cash register along with an unusual shaped "tip glass" which was kept beside the cash register and in which were kept bent coins and those marked with fingernail polish that some establishments use in coin-operated devices. It was discovered that Mr. Felling's billfold which he had loaned to the victim the afternoon before was also missing. This billfold had Felling's signature on it in gold leaf.

On May 28, 1962, a glass resembling the "tip glass" was found by the landlady while cleaning the apartment appellant had rented for a week. This apartment was about one block from the scene of the homicide. The rental period had expired two days before and appellant had moved out. In the glass was a quarter with red fingernail polish on it. She turned these over to the police who then apprehended appellant in a bar at about 3 p. m. the following day, May 29, 1962. He was taken to the police station and interrogated, during the course of which he allegedly consented to a search of the apartment at 4205 East Thomas Road, where he was then living, and he confessed to the crime. At 4:47 p. m. a court reporter took down his confession to the commission of this crime. The police also obtained a warrant to search the apartment at 4205 East Thomas Road. In the course of such search the police seized the alleged murder weapon and Mr. Felling's billfold. In addition they found loot from a Phoenix mortuary which had been burglarized, as well as a purse and identification of an alleged homicide victim in Ohio.

Prior to trial appellant filed two motions to suppress evidence; a hearing was held and the motions were overruled. A plea of insanity was entered but later withdrawn by appellant and the matter went to trial on a plea of not guilty. When the evidence was offered during trial, objection to the same was again made and overruled. No defense evidence was presented and a verdict of guilty was rendered.

■ The first alleged error raised by appellant is the introduction into evidence of the gun and billfold which he maintains were obtained as a result of an illegal search and seizure. Both motions to suppress the evidence were supported by affidavits of defense counsel. They were to the same general effect; that the original search warrant could not be located in the offices of the appropriate public officials. A hearing was held on the motions at which it became apparent that the original search warrant had been lost or misplaced; however, the landlord of the apartment in question brought in the copy of such warrant that had been given to him by the officer at the time of the search. The magistrate who issued it testified and identified it as a

copy of the one he issued to Sergeant Evan Wilson. This matter was cleared up after the trial when the original search warrant was found by the trial court in a box of newspapers and magazines submitted by appellant in support of another motion. Appellant was not prejudiced by this slight irregularity as it did not affect the validity of the warrant.

It is apparent from the record that the hearing on the motions to suppress was not limited merely to the disappearance of the original search warrant but also covered both the facts leading up to the issuance of the warrant and the alleged consent to a search without a warrant. As the motions contained general allegations that the search and seizure was illegal and in violation of appellant's rights under the United States Constitution, and the Constitution and Statutes of Arizona, these facts were pertinent. No reasons were set forth by the Court for overruling the motions. We further note that during the trial when appellant again objected to the introduction of the gun and billfold as having been secured through an illegal search and seizure the trial court overruled such objection on the grounds that this had been disposed of by the court's previous ruling on the motions to suppress.

At the hearing on the motions to suppress Sergeant Wilson, who obtained and executed the search warrant, testified that he saw appellant for a split second through the doorway into the interview room in the detective bureau while the interrogation was being conducted. He further stated that he secured the search warrant on the basis of information he received from Sergeant Seymour Nealis, one of the officers who conducted the interrogation of appellant.

Sergeant Nealis testified at this hearing that he told Wilson to get a search warrant for the following reasons:

"Mr. Sherrick had told me he had been living at that address under the name of Myers, and I asked him if he would care if we went out there and searched it. He said he had no objection. I said I would get a search warrant, or have somebody get a search warrant, and go out and search it. Mr. Sherrick said he would accompany me out there to search it. However I felt better of it and had Sgt. Wilson get a search warrant."

Sergeant Nealis was further cross-examined as to his reasons that he felt justified in the obtaining of a search warrant at that time, and answered thusly:

"He told us he had been living at 508 North 7th Avenue, and we had in our possession a glass and a coin, and he admitted * * * and he identified this glass as having been in his possession at that address, and we had

previously had this identified as coming from the Green Goose Tavern—this glass and coin — where the — homicide —."

■ In addition Sergeant Nealis stated specifically that he was given unqualified permission by appellant to search his apartment. It was also brought out that when appellant was first taken to the interrogation room he emptied his pockets and a key he had indicated the address of the East Thomas Road apartment and the name Jim Meyers. Later interrogation revealed appellant was living there under that name. The facts herein clearly indicate that at the time he was apprehended, "probable cause" existed for appellant's arrest for the homicide, with or without a warrant. This discovery of his address and alias through the key found in his pocket was therefore the result of a search incident to a lawful arrest. Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327; Cf. Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142; Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed. 2d 1503; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

Both Sergeant Wilson and Magistrate Roy Carson also testified at the hearing on the motions to suppress regarding the events immediately preceding the issuance of the warrant. The Sergeant first discussed the problem with the City Prosecutor and then gave the information to the stenographer who made up the search warrant. He then took it to Magistrate Carson who questioned him. This was corroborated by the Magistrate, who testified:

"First I examined the officer under oath, to see if there's probable cause, to determine if there's probable cause for the warrant to issue. Then I had him sign in my presence under oath."

It is apparent, therefore, that the investigating officers did not rely solely upon the claimed oral consent to search but sought and received a determination of probable cause "by a neutral and detached magistrate". Johnson v. United States, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436. This is the procedure strongly recommended, if not required, by the United States Supreme Court. See, e. g., United States v. Ventresca, 85 S.Ct. 741 (Decided March 1, 1965).

■ This Court is, of course, bound by the decisions of the United States Supreme Court interpreting the Federal Constitution. State v. Kananen and Hill, 97 Ariz. 233, 399 P.2d 426 (Feb. 25, 1965); State v. Pina, 94 Ariz. 243, 383 P.2d 167. In Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed. 2d 1081, it was decided that evidence obtained in violation of rights guaranteed by the Fourth Amendment to the Constitution of the United States was not admissible in a state court in a prosecution against the

individual whose rights had been violated. State v. Pina, supra.

The Supreme Court of the United States has spelled out quite clearly the right of an individual to be free from unreasonable searches and seizures, and they have specified with great particularity the prerequisites for a valid search warrant. e. g., United States v. Ventresca, supra, and Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723. Both of these decisions involved a determination by that Court of the sufficiency of the affidavits for a search warrant. In Aguilar it was stated:

"It is elementary that in passing on the validity of the warrant, the reviewing court may consider only information brought to the magistrate's attention. Giordenello v. United States, 357 U.S. 480, 486 [78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503]." 378 U.S., at 109, ftn. 1, 84 S.Ct. at 1511.

■ The testimony of the police officers and the magistrates indicates that information was given to the magistrate under oath in addition to the affidavit.[1] This procedure differs from that under Rule 41(c) Federal Rules of Criminal Procedure where the affidavit is the sole basis upon which the determination of probable cause is made. If we had before us only the affiadvit we would undoubtedly be bound to conclude under the case of Aguilar v. State of Texas, supra, that it was insufficient. It would have been advisable for the magistrate to have a transcript made of the officer's testimony, which he gave in addition to the affidavit, and he should have recited on the record what facts presented to him constituted "probable cause." This deficiency we do not deem fatal under the circumstances herein as there is evidence in the record showing what was presented to the magistrate prior to the warrant in question being issued.

Certainly these police officers were following the spirit of the Supreme Court decisions. We note that as recently as 1963 (two years after the decision in Mapp v. Ohio, supra) the Supreme Court in Wong Sun v. United States, 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, indicated that even illegally obtained evidence was still admissible under certain circumstances; and that the exclusionary rule has no application where "the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.' Nardone v. United States,

---

1. 5 A.R.S. § 13–1444 provides:

"A. The magistrate shall, before issuing the warrant, examine on oath the complainant and witnesses the complainant produces, take their depositions in writing, and cause them to be subscribed by the parties making them.

"B. The depositions shall set forth the facts tending to establish the grounds of the application or probable cause for believing they exist."

308 U.S. 338, 341 [60 S.Ct. 266, 268, 84 L.Ed. 307]."

■ From reviewing this record it is clear that at the time they sought the search warrant the police did have knowledge of facts undoubtedly sufficient to constitute "probable cause" for the issuance of the warrant. They had the "tip glass" and coin identified as having been taken from the tavern at the time of the homicide and later found in appellant's former apartment. The key found in appellant's pocket after he was apprehended established the East Thomas Road apartment as his probable residence subsequent to the one near the homicide scene and the alias, Jim Meyers, that he was using.

In addition to the above we have the aforementioned consent to search which the police maintain appellant gave them orally during the interrogation. It is not clear whether such consent was given before or after he confessed and one of the officers testified that he confessed after being told that they had the gun and billfold although these items were not shown to him. The written confession itself indicates that at that time appellant did not know whether these items were still in his residence or if the police had them.[2] Just recently this Court in State v. Kananen and Hill, 97 Ariz. 233, 399 P.2d 426 (Decided Feb. 25, 1965), reiterated that in determining whether or not consent to a search was given, "it is necessary that such a waiver or consent be proved by clear and positive evidence in unequivocal words or conduct expressing consent, and it must be established that there was no duress or coercion, actual or implied. State v. Tigue, 95 Ariz. 45, 386 P.2d 402; State v. Robinson, 74 N.J.Super. 305, 181 A.2d 208." 97 Ariz. at 235; 399 P.2d at 427.

■ In Kananen and Hill, supra, the police did not attempt to get a search warrant and the question was whether the state proved consent by clear and positive evidence in unequivocal words or conduct expressing consent. After reviewing the evidence this Court concluded: "The most that one could say would be that the answer *implied* that consent was given." 97 Ariz. at 237; 399 P.2d at 428. (Emphasis added). In the case at bar there was a direct conflict between the testimony of the officers and that of appellant on the question of

2. The reporter's transcript of the confession contains the following:
"Q. Where is the gun?
"A. As far as I know, its home unless the boys have got it. Your boys.
 * * *
"Q. You say the gun and the empty shell casings are probably still in the gun?
"A. Yes, as far as I know they are.
"Q. And is there anything else at your house, at your apartment that came from the bar?
"A. The billfold.
"Q. His billfold? This would be the man's that you shot billfold?
"A. Yes."

consent; however, the testimony of the officers, which the trial court accepted as true, certainly was, "clear and positive evidence in unequivocal words." The fact that appellant readily gave a full confession certainly is conduct consistent with the giving of consent, particularly where the evidence of its voluntariness is so strong.[3] The degree of affirmative assistance given to the police by the suspect is relevant in determining whether consent exists. See United States v. Burgos, 269 F.2d 763 (2nd Cir.1959), cert. denied, 362 U.S. 942, 80 S.Ct. 808, 4 L.Ed.2d 771 (1960); United States v. MacLeod, 207 F.2d 853 (7th Cir. 1953).

■ If the confession were given prior to the application for the search warrant certainly that in and of itself would have constituted "probable cause" for its issuance providing the confession was voluntarily made. The record on this point clearly shows it was made voluntarily,[4] and in this appeal the voluntariness is not questioned. The testimony of Sergeant Wilson appears to indicate that he so informed the issuing magistrate when he was orally examined under oath.

■ We have searched the record to determine if the procedure set forth by the United States Supreme Court in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 has been complied with. The Jackson case held that an accused is constitutionally entitled to an adequate evidentiary hearing productive of reliable results concerning the voluntariness of his confession, and only if the trial court determines it was voluntary will it be submitted to the jury for their determination of the same question as part of their deliberations.

The record herein reveals that during trial, and prior to the introduction of appellant's confession, a special hearing was held, outside the presence of the Jury, and limited to the determination of the voluntariness of such confession. At this hearing both interrogating officers, Brady and Nealis, and the appellant testified. The officers denied using any force, promises,

---

3. During the trial a special hearing on the voluntariness of the confession was held in the absence of the Jury at which defendant was given the opportunity to testify without waiving his rights and he testified as follows:
"CROSS EXAMINATION
"BY MR. SHAW:
"Q. Did Mr. Nealis or Mr. Brady use any force on you?
"A. No sir, they did not.
"Q. Did they make any promises?

"A. No sir, they did not.
"Q. Did they make any threats?
"A. No.
"Q. They treated you very nicely?
"A. Yes, they did.
"Q. And in spite of the circumstances here, I think you will go along with the fact that both Brady and Nealis treated you like a man?
"A. They treated me like a man, yes sir."
4. See note 3, supra.

threats or coercion during the questioning, and defendant himself testified that they made no promises nor threats and treated him nicely. At the conclusion of the special hearing the court found the statement to have been "voluntarily given and was given without threats or promises of immunity or coercion of any kind" and thereby admissible.

As part of his general charge to the Jury the Court instructed them as follows:

"You are further instructed that the law absolutely forbids you to consider a confession in determining the innocence or guilt of a defendant unless the confession was voluntarily made. And although the Court has admitted evidence tending to show that defendant made a confession, you must disregard the asserted confession entirely unless you, yourselves, by your own weighing of all the evidence, your own judging of the credibility of the witnesses, and your own reasonable deductions, conclude that the alleged confession not only was made, but was voluntary."

It is our opinion that the requirement of Jackson v. Denno, supra, was complied with, as well as those set forth by this Court in State v. Owen, 96 Ariz. 274, 394 P.2d 206.

On another point the transcript of the hearing on the motion to suppress is some-what confusing. Sergeant Wilson admitted that some of the items described in the search warrant were added to it after he had searched the premises and found them. He admitted two or three were added to the warrant, but we also note from the record that comparison of the items listed on the search warrant with those described in Sergeant Wilson's affidavit upon which the magistrate issued the warrant, reveals that almost the identical items are listed on the two documents. The only exception is that the search warrant lists both a shotgun and a 12-gauge shotgun, Serial #197079V, and the affidavit lists only a shotgun. The inventory of property taken in the search indicates only one shotgun was seized.

■ A visual inspection of these two documents by this Court indicates that the last three items on each were added at some time after the rest of the documents were typed. This is obvious not only by observing the typing but also by virtue of the fact that nothing in this record indicates the searching officer had any knowledge, at the time he applied for the warrant, that the purse of the alleged Ohio homicide victim was in appellant's apartment. Neither does it appear that they had any prior knowledge connecting appellant with the mortuary burglary. While we do not condone this practice we fail to see how defendant's fundamental rights were prej-

udiced as the items added concerned other alleged crimes. It is noted that the items involved in these other alleged crimes were also listed on Sergeant Wilson's affidavit for the warrant. It is our opinion that while appellant's complaints regarding the procedure are well-founded in fact they are not determinative of the question before us. These items, which were undoubtedly added after their seizure, were connected with entirely separate offenses for which he was not being tried, and were not offered into evidence at the trial. The gun and billfold are the items we are concerned with, and they were described adequately. Cf. Stanford v. State of Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (Jan. 18, 1965).

▆ One other questionable matter is brought to our attention; that the inventory and return of the warrant was not until approximately sixty days after it was issued and executed. This procedure is claimed to be violative of A.R.S. § 13–1448. While the return should have been made within ten days under that statute, failure to comply in this regard is not fatal, as it was clearly executed within ten days and the statute states: "After the expiration of that time, the warrant shall, *unless executed,* be void." (Emphasis added).

The Supreme Court of California was faced with a somewhat similar fact situation involving the introduction into evidence of articles belonging to a murder victim which were seized from the defendant's room during an illegal search. In re Shipp, Cal., 43 Cal.Rptr. 3, 399 P.2d 571 (1965). They held that, "although the police officers had not obtained a warrant and although the evidence did not clearly demonstrate a valid consent to the search, the introduction of the evidence constituted harmless error. We concluded that it was not reasonably probable that a result more favorable to the petitioner would have been reached if the trial court had excluded the evidence. The admission of evidence obtained by an illegal search and seizure does not require reversal if it constitutes harmless error. (People v. Parham (1963) 60 Cal.2d 378, 384–386, 33 Cal.Rptr. 497, 384 P.2d 1001.)"

The Shipp case, supra, was founded on the "harmless error" doctrine, which is equally as applicable to the case at bar; however, we have here a fact situation which indicates that the actions of the police were much more in line with the rules laid down by the United States Supreme Court for the protection of an individual's rights guaranteed by the United States Constitution. In the case before us only technicalities of a comparatively minor nature are involved.

▆ Appellant urges that the search warrant was improper in that it directed that such search could be made at night. His argument is based on A.R.S. § 13–1447

which requires a direction that it be served in the day time, "unless the affidavits are positive that the property is * * * in the place to be searched, in which case he may insert a direction that the warrant be served at any time of the day or night." This warrant was served or executed during the day and in light of all the circumstances appellant was not prejudiced in any way by the fact that the magistrate authorized a search at night without the affidavit being couched in positive terms.

 It is also worthy of note that the manner in which this evidence was obtained does not in any way detract from its reliability as evidence. While this alone does not make it immune from the exclusionary rule imposed upon the state courts by Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, it is a factor to be considered. See Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed. 2d 856. In Mapp v. Ohio, supra, the Supreme Court based its decision, at least in part, on their conclusion that in many states the exclusionary rule is the only protection afforded against unreasonable searches and seizures, Id., 367 U.S. at 651–652, 81 S.Ct. at 1689. They pointed out that the Supreme Court of California in imposing the exclusionary rule felt, " 'compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions. People v. Cohen [Cahan], 1955, 44 Cal.2d 434, 445, 282 P.2d 905, 911 [50 A.L.R.2d 513]' ". It was pointed out in this regard that less than half the states have any criminal provisions relating directly to unreasonable searches and seizures. 367 U.S. at 652 n. 7, 81 S.Ct. 1689. Arizona citizens do have, however, both civil and criminal sanctions available to them as a protection of their rights of privacy. A.R.S. § 13–1454 provides that "A person who maliciously and without probable cause causes a search warrant to be issued and executed, is guilty of a misdemeanor." It is also to be noted that the doctrine of governmental immunity from liability for tortious acts committed by agents and employees acting within the scope of their employment was abolished by this Court in Stone v. Arizona Highway Commission, 93 Ariz. 384, 381 P.2d 107. Article 2, Section 8, Constitution of Arizona, A.R.S., provides that: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." This Court has said that an action for damages lies against one responsible for an unlawful search and seizure in violation of the Fourth Amendment, Constitution of the United States, and, if the one responsible for such search and seizure is an officer of the court, he may be punished by the court as for a contempt. State v. Berg, 76 Ariz. 96, 259 P.2d 261;

State v. Frye, 58 Ariz. 409, 120 P.2d 793.[5] (Both of these decisions were overruled on other grounds in State v. Pina, 94 Ariz. 243, 383 P.2d 167.)

While we feel the above clearly shows that the basic reasons behind the decision in Mapp v. Ohio, supra, do not exist in Arizona, we recognize that we are bound by the rule of law set forth therein. We point out these factors as being relevant to the case at bar in light of the technical deficiencies discussed herein.

Appellant also urges that he was intimidated by the prosecutor into withdrawing his plea of not guilty by reason of insanity by the prosecutor's threat to bring out other crimes. The trial court indicated that if evidence as to insanity was presented he would permit the State to put on any evidence that they have to rebut it. This would certainly be proper. As no such evidence was offered, and consequently, no ruling made, there is nothing before us to review in this regard.

Also urged as error is the introduction into evidence of the alleged murder weapon and the two empty shell casings found in it. Appellant's objection is based on the failure of the State to prove a complete chain of possession. These exhibits were identified as having been found in appellant's apartment and identifying marks placed on them at the time of their discovery. The Ballistics expert testified that the fatal slugs could have come from the shell casings and could have been fired from the gun in evidence. He stated that there was more than a mere possibility but he could not state it positively as the slugs were too badly mutilated, which mutilation could have come from striking bone. He testified that the exhibits in question were received by him through the mail from the Phoenix Police Department on June 1, 1962. The defects complained of are the lack of any showing that they were sent to the expert or that they were in substantially the same condition as when found. He complains also that the chain of possession was not established. It is our opinion that these alleged defects are such as could effect the weight to be given the evidence but do not destroy their admissibility where, as here, they were properly identified. It is to be noted that the gun and shell casings were seized May 29, 1962, in Phoenix, Arizona, and were received through the mail by the expert in Washington, D. C., on June 1, 1962.

The photographs of the victim, which were introduced into evidence, are asserted by appellant to be inflammatory and thereby prejudicial. We find no merit in this contention as it is well settled that such photographs are admissible for the

5. Regarding these points see article by Chief Justice Kingsley A. Taft of the Supreme Court of Ohio, 50 A.B.A. Journal 815.

purpose of aiding the Jury to fix the punishment, to show the wounds which caused the death and to corroborate the State's theory of how and why the murder was committed. Burgunder v. State, 55 Ariz. 411, 103 P.2d 256.

■ The next point raised is that Officer Coker was allowed to testify as to what he saw Sergeant Wilson do. This he erroneously brands as hearsay. Sergeant Wilson had sustained a heart attack shortly prior to the beginning of the trial. Officer Coker, who accompanied Wilson when the exhibits were found, testified only as to his observations and not what was told to him. This clearly is not hearsay testimony. Somewhat associated with this assignment of error is appellant's allegation that he was prejudiced by Officer Coker's name being endorsed on the information in place of Sergeant Wilson's only one day before the trial began. Rule 153, Rules of Criminal Procedure, 17 A.R.S., requires the endorsement of names of the State's witnesses on the information. Rule XIII (e) of the Rules of the Superior Court of Maricopa County, 17 A.R.S., require this to be done at least five days before the date of trial, however, it further provides that other names may be added if such witnesses are discovered with due diligence prior to the date of trial. Discretion is vested in the Court in this regard. We have recently held that the failure to comply with Rule 153 does not in and of itself disqualify one whose name is not so endorsed from being called as a witness. State v. Lovell, 97 Ariz. 269, 399 P.2d 674 (March 3, 1965). This is a matter lying within the sound discretion of the trial court. The record indicates that Coker testified to substantially what Wilson would have, had he been physically able to appear as a witness. Appellant was notified of the change five days before he actually took the witness stand. Under these circumstances we find no abuse of discretion.

In view of the decision in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, we have studied the record with regard to appellant's right to counsel. The record indicates that a criminal complaint was filed and a warrant of arrest for murder was issued on May 31, 1962. On June 1, 1962, appellant was brought before the Justice of the Peace, informed of the charge against him and of his right to the aid of counsel. Co-counsel was appointed to represent him on June 15 and his preliminary examination held on June 19, 1962.

■ Sergeant Brady, one of the two interrogating officers, testified that the other interrogator, Sergeant Nealis, advised appellant during their questioning that he could contact an attorney and that he did not have to make any statements regarding the homicide. Sergeant Nealis corroborated this and added that he warned ap-

pellant that anything he said could be taken down and used against him. Appellant also corroborated this fact to some extent in his testimony when he stated he asked to call an attorney and the reply was: "Mr. Nealis told me that, 'you know what an attorney will tell you, to keep your mouth shut, don't tell them a thing. We have got you cold on this.'" He further testified that they did not give him an opportunity to call an attorney until after he was booked although he asked to call one during his interrogation. Under the circumstances herein it is our opinion that appellant was effectively warned of his constitutional rights to remain silent and to have the assistance of counsel, and knowingly waived such rights.

In Escobedo v. State of Illinois, supra, 378 U.S., at 491, 84 S.Ct., at 1765, the Supreme Court referred to its prior decision in Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 in the following manner:

"Crooker v. [State of] California, 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448], does not compel a contrary result. In that case the Court merely rejected the absolute rule sought by petitioner, that 'every state denial of a request to contact counsel [is] an infringement of the constitutional right *without regard to the circumstances of the case.*' Id., [357 U.S.,] at 440

[78 S.Ct., at 1292]. (Emphasis in original.)

In its place, the following rule was announced:

"'[S]tate refusal of a request to engage counsel violates due process not only if the accused is deprived of counsel at trial on the merits, * * but also if he is deprived of counsel for any part of the pretrial proceedings, provided that he is so prejudiced thereby as to infect his subsequent trial with an absence of "that fundamental fairness essential to the very concept of justice." * * * The latter determination depends upon all the circumstances of the case.' 357 U.S., at 439–440 [78 S.Ct., at 1292]. (Emphasis added).

"The Court, applying 'these principles' to 'the sum total of the circumstances [there] during the time petitioner was without counsel,' id., [357 U.S.], at 440 [78 S.Ct., at 1292], concluded that he had not been fundamentally prejudiced by the denial of his request for counsel. Among the critical circumstances which distinguish that case from this one are that the petitioner there, but not here, was explicitly advised by the police of his constitutional right to remain silent and not to 'say anything' in response to the questions, id., [357 U.S.], at

437 [78 S.Ct., at 1290], and that petitioner there, but not here, was a well-educated man who had studied criminal law while attending law school for a year. The Court's opinion in Cicenia v. La Gay, 357 U.S. 504 [78 S.Ct. 1297, 2 L.Ed.2d 1523], decided the same day, merely said that the 'contention that petitioner had a constitutional right to confer with counsel is disposed of by Crooker v. [State of] California * * *.' That case adds nothing, therefore, to Crooker. In any event, to the extent that Cicenia or Crooker may be inconsistent with the principles announced today, they are not to be regarded as controlling." (footnote omitted)

It is to be noted from the above quoted language that Crooker was distinguished from Escobedo in that Crooker had been advised of his constitutional right to remain silent and was a well-educated man. We find both of these "critical circumstances" to be present in the case at bar also. Appellant admitted: "Mr. Nealis told me that I didn't have to talk to him if I didn't want to, and I told him I would want to talk to him if my attorney was present." There is no testimony of the amount of appellant's formal education but the written statement which he read to the Court prior to sentence being pronounced indicates he was a well-educated man. The following excerpts from such statement are illustrative:

"Facing the maximum penalty for the maximum offense, we understand the court's hesitancy to check the prosecution's zeal for justice, however, we do not believe that justice predominates on one side of the scale. Numerous examples of one-sided self-justifications have appeared throughout this trial, and this Court has seen fit to nod its approval to the unethical and unjustified vicious means used by the prosecution to win this case.

"We can examine the record and point out these examples in detail. However, the Court well knows the myriad of errors in jurisprudence, to say nothing of the vast amount of admissions into evidence of testimony by the witnesses and unethical, totally irresponsible outbursts of the prosecution.

"We can point out the hesitancy of the expert witness to identify the weapon admitted into evidence as being the murder weapon. We can point to the prosecution's identification of this defendant for a witness called to identify me, the insatiable antics of the prosecution in his summation, those of assuming a power reserved for the Court alone—the instructions to the jury. * * *

"Rare is the person who can weigh the faults of others without putting his thumb on the scales. But when life itself is at stake, no 'meat-market' attempts at justice can be accepted. We also realize the tremendous responsibility placed on the jurors who have presided here under your guidance.

\* \* \* \* \* \*

"The Court's permission alone allowing the prosecution to dissertate on the 7 or 8 year minimum of the life sentence was as much their default to justice as the Court's. As Justice Robert II. Jackson adminished, 'It is not the function of the government to keep its citizens from falling into error; it is the function of the people to keep its government from falling into error.'

"Therefore, the responsibility of injustice being borne by this Court is also shared, not only with the prosecution, but by the jury as well and the public as a whole."

During his reading of this statement appellant was interrupted by the prosecutor and asked who prepared it for him. Appellant stated he prepared it himself and both co-defense counsel denied that they had seen it before that day. It is also to be noted appellant had been imprisoned in Ohio for five years which indicates he had first hand knowledge of the rights of an accused. See State v. Cuzick, 97 Ariz. 130, 397 P.2d 629.

In view of the above we feel that the principles set forth in Crooker v. State of California, supra, are applicable to the instant case; that under these circumstances appellant's constitutional right to counsel guaranteed by the Sixth Amendment of the Constitution of the United States has not been infringed.

We further find that the principles of law announced in Escobedo v. State of Illinois, supra, are not applicable to the instant case for the same reasons set forth by this Court in State v. Miranda, 98 Ariz. 18, 401 P.2d 721. (April 22, 1965). In Miranda we discussed fully the Escobedo case, supra, and said:

"Under these circumstances, after review of the facts and the decisions on the question, the court stated:

" 'We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not ef-

fectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342 [83 S.Ct. 792, at 795, 9 L.Ed.2d 799], and that no statement elicited by the police during the interrogation may be used against him at a criminal trial. [378 U.S. at 490, 84 S.Ct. 1758 at 1765]'"

"It will be noted that the court in the Escobedo case set forth the circumstances under which a statement would be held inadmissible, namely: (1) The general inquiry into an unsolved crime must have begun to focus on a particular suspect. (2) The suspect must have been taken into police custody. (3) The police in its interrogation must have elicited an incriminating statement. (4) The suspect must have requested and been denied an opportunity to consult with his lawyer. (5) The police must not have effectively warned the suspect of his constitutional rights to remain silent." 98 Ariz. at 32, 401 P.2d at 730.

While the first three of the above-enumerated circumstances probably are present in the case at bar, the latter two are not. During the hearing on voluntariness of his confession Sergeant Nealis testified, "I also told him that he had a right to call an attorney if he wanted to," and that appellant replied, "he did not have an attorney to call." Sergeant Brady corroborated this although appellant denied it and stated that he asked to call an attorney. The court resolved these issues of facts against the defendant and held the confession to have been voluntarily given, and admissible; thereby holding that his fundamental rights had not been violated. The last circumstance aforementioned is clearly lacking in the cause before us. In his own testimony appellant stated Sergeant Nealis told him, "You know what an attorney will tell you, to keep your mouth shut, don't tell them a thing."

As in State v. Miranda, supra, we find here that the facts and circumstances show:

"that the statement was voluntary, made by [appellant] of his own free will, that no threats or use of force or coercion or promise of immunity were made; and that he understood his legal rights and the statement might be used against him. Under such facts and circumstances we hold that, notwithstanding the fact that he did not have an attorney at the time he made the statement, and the investigation was beginning to focus upon him, [appellant's] constitutional rights were not violated, and it was proper to admit

the statement in evidence." 98 Ariz. at 36, 401 P.2d at 733.

A review of the entire record in this case leaves no doubt but that appellant committed the murder as charged. The record also indicates that appellant served a five year sentence in Ohio for a conviction of embezzlement and that the loot from a burglary of a Phoenix mortuary was found in his room during the search in question. This record is bereft of any defense evidence or even mitigating circumstances. In his confession he readily admits that the victim complied with his every request, even to rolling over face down on the floor and thus allowing appellant to put two bullets into the back of his head without having to observe the last anguished expression on deceased's face.

It is clear that all of the events in question occurred during the short period of approximately two and one-half hours. During this time appellant was apprehended, interrogated, consented to the search, the search warrant was applied for, the magistrate issued the warrant, such warrant was executed, the articles were seized, appellant gave a full confession, and he was booked for homicide.

It is therefore our opinion that the doubtful procedure used in securing the search warrant and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint". Wong Sun v. United States, 371 U.S. 471, 487, 83 S.Ct. 407, 417, 9 L.Ed.2d 441.

We conclude that in light of all the circumstances herein, the rights of appellant were not fundamentally prejudiced. He was afforded a trial the record of which reflects "that fundamental fairness essential to the very concept of justice." Escobedo v. State of Illinois, 378 U.S. 478, 491, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977.

Judgment affirmed.

LOCKWOOD, C. J., STRUCKMEYER, V. C. J., and BERNSTEIN and McFARLAND, JJ., concur.