481 P.2d 271

The STATE of Arizona, Appellee,

v.

Daniel Webster TILLERY, Appellant.

No. 1835.

Supreme Court of Arizona,
In Banc.

Feb. 19, 1971.

Gary K. Nelson, Atty. Gen. by Carl Waag, Asst. Atty. Gen., Phoenix, for appellee.

Mangum, Wall & Stoops by Richard K. Mangum, Flagstaff, for appellant.

UDALL, Justice:

Daniel Webster Tillery appeals from his conviction of assault with a deadly weapon and armed robbery. He was sentenced to serve consecutive prison terms of not less than nine nor more than ten years for the former offense and not less than fifteen nor more than thirty years for the latter.

The evidence introduced at trial indicates that on January 31, 1967, at approximately 5:30 p. m., defendant and his brother, Albert, stopped at the "Cliff Dwellers Trading Post" in northern Coconino County to service their car, a 1953, two-tone Chevrolet. As defendant was pouring oil into his engine he spilled some on the concrete near the gasoline pumps. This caused an argument to flare up between defendant and Vern Baker, the operator of the Trading Post. At their trial Albert Tillery turned state's evidence and accepted the bargain offered him by the state. He testified that Vern Baker had insulted his brother, who then followed Mr. Baker into the service station office. Before going inside the de-

fendant allegedly told Albert he was "going to get" Baker. Albert testified that he heard sounds of a struggle and upon entering the office found defendant leaning over the now prostrate Vern Baker, repeatedly striking him over the head with a wrench. Albert then allegedly pulled him away from the seriously injured Baker and together they fled. Minutes later, a patron of the cafe discovered Baker's body and, with the help of another customer, rushed him to a hospital. Although Baker had partially recovered, the numerous skull fractures inflicted by the beating have left him in a childlike condition. Dr. Ivan Wesley Kazan, the examining physician, testified as to the nature and extent of Mr. Baker's injuries:

Q Now Doctor, I believe you have related to the jury that Mr. Baker was suffering from head wounds. Would you describe these head wounds to the jury, please?

A Well, there were multiple depressions and lacerations of the scalp, particularly on the right side of the scalp. I don't remember exactly how many there were, but there were at least twelve or fifteen, and in cleaning up these wounds I noted that the skull was fractured, and during the course of the examination too, we got some X-rays on his head and could see that he had numerous skull fractures. Reporter's Transcript of Proceedings at 158–9.

\* \* \* \* \* \*

Q Did you at this time make any other determination as to the number of skull fractures?

A Well, there were numerous skull fractures and actually we didn't count the number of pieces of bone that we took out or the number of fractures. It is like trying to count the number of pieces that you have if you dropped a hardboiled egg on a piece of concrete, because there were just about that many fractures." Reporter's Transcript of Proceedings at 161.

Defendant and his brother were subsequently arrested while walking along the highway after their car had broken down. The initial arrest was effected by the two Utah police officers who, having been warned to be on the look-out for two suspects believed to be heading toward the Utah State border in a 1953, two-tone Chevrolet, joined Arizona officials in the search. They came upon defendant and his brother in Arizona, about one mile from the road-block which had been set up by Arizona authorities. A few minutes after placing them under arrest, but prior to giving the standard Miranda warnings, See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), two Arizona highway patrolmen drove up. As they were getting out of their patrol car one of the officers called out: "Where's their car?" Defendant spontaneously responded that it was "up the road aways." The car was, shortly thereafter, found parked along the highway a short distance from where they were arrested. The car was parked in plain sight of traffic; no attempt having been made to hide the vehicle. A search warrant was subsequently issued; their car impounded and searched; and the wrench, used by defendant in beating Mr. Baker, was seized. At defendant's trial Federal Bureau of Investigation agents testified as to the results of certain tests performed on the wrench. Their testimony indicated that traces of human blood, as well as uprooted human hairs matching those of Vern Baker, were found caked onto the upper, heavy part of the wrench. Other witnesses testified as to defendant's presence at the scene of the crime just minutes before Vern Baker was found lying unconscious in a pool of blood. This evidence, along with defendant's brother's testimony, helped set the stage for his conviction.

■ Defendant's first contention is that the trial court committed reversible error in "refusing to let him testify over his request that he be allowed to do so." We cannot agree with defendant that he was re-fused an opportunity to testify in his own behalf. Nowhere does the record indicate that the defendant made any request to the court, whatsoever, of his intention to take the witness stand. What the record does reveal is that defendant's counsel did bring to the court's attention the fact that defendant had, on several occasions, expressed a desire to testify. This alleged desire was first made known to the presiding judge only after defense had rested but just prior to closing arguments. His attorney noted, however, that defendant's desire was unsettled: constantly vacillating. One moment his enthusiasm would loom large; the next moment it would vanish. The following dialogue between the trial judge and defense counsel in chambers, just prior to closing arguments, clearly portrays the situation as it then existed:

"THE COURT: State your position, Mr. Flournoy, on the defendant taking the witness chair because of State v. Martin [infra].

"MR. FLOURNOY: The problem of whether the defendant should take the stand has come before both Mr. Lincoln and myself in representing Daniel Tillery, and *for weeks Daniel has told me at various times that he wanted to take the stand, while at other times he said he didn't want to take the stand.*

\* \* \* \* \* \*

"Pursuant to that I went to the jail, talked to Daniel Tillery. I don't know the extent of the time I talked to him, but I advised him of two things: No. 1, that *I suggested* that he should not take the stand because I think it would be detrimental to his case. *And I said if he wanted to take the stand he was entitled to take the stand and he could so take the stand.*

"It was at this time that Daniel Tillery advised me that a Coconino County Deputy had stated to him that there was no way that his defense attorneys could keep him off the stand if he wanted to take the stand.

"I therefore said, 'If you want to take the stand just tell me so I will know how to prepare my final argument.'

"He told me approximately five to ten times when I asked him that he did not at that point want to take the stand.

"It could have been more times, because I spent a lot of time—it appeared to me he was rational, he knew what he was doing, he was not in one of his fits. I am sure he understood what we were talking about.

\* \* \* \* \* \*

"I don't know how long we talked to him, but this was the last time I saw him. I did not see him on the night of May 3rd. The next time I saw him was in court.

"The only question—he asked me this morning, he leaned over and said, 'Have they dismissed the charges yet,' to which I answered, 'No.'

"The next thing we did, we called Ralph Haines as out witness. After questioning him I approached the Bench and told the Judge of what had happened; that he had made no requests.

"I then went back and stated the defense rests.

"Mr. Egan then said he had no rebuttal.

"And as Judge Wren was explaining to the jury that they could come back in a few minutes, and recessing the Court, he leaned over and said, 'I want to take the stand.'

"This was the first time he had said it to me today.

"Court was adjourned, and subsequently we learned that he asked the deputies, and George Carley, Deputy of Coconino County—that he, Daniel Tillery had informed the Deputies that he wanted to take the stand.

"Is that clear enough?

"THE COURT: What is your position if he makes a demand to take the witness stand during closing arguments of the attorneys?

"MR. FLOURNOY: My personal opinion is I don't really care, for my own self, whether he takes the stand, but as his attorney I think it would be very detrimental for him to take the stand. I think it would cause an uproar, cause havoc, and be detrimental.

*"But if he wants to take the stand I think he should be allowed to take the stand.*

[Emphasis Added] taken from Reporter's Transcript at 695–700.

In State v. Martin, 102 Ariz. 142, 426 P. 2d 639 (1967), we stated that where the record "clearly" shows that defendant and his attorney were in disagreement as to the attorney's determination to keep defendant off the stand, and where the record also disclosed no evidence of the defendant's later acquiescence not to take the stand, we would consider the trial court's refusal to allow defendant to take the stand reversible error.

The facts in the instant case are fundamentally different from those in the *Martin* case. Here, there was no real disagreement. While defense counsel thought it best to keep defendant off the witness stand; the record, supra, discloses that defense counsel agreed with defendant that "if he wanted to take the stand he was entitled to take the stand and he could so take the stand." Were defendant's desires to testify in his own behalf as strong and unrelentless as he now claims they were, he would not have maintained his silence throughout the entire trial. He might very easily have directed his request to the court or made motion to have his attorney removed.

"\* \* \* But if the record shows that a defendant makes proper and timely demand to take the stand contrary to the advice given by his counsel, such a defendant has the right to give an exposition of his defense before a jury. This insistence may be fatal to his chances of acquittal, but to prevent him from doing so, if the record adequately shows his firm desire to testify, would be to deny

him a right that every defendant should have in a criminal case. In such circumstances, a defendant should first request the court to remove his attorney and substitute a new lawyer or the defendant in person. (People v. Jackson, 186 Cal.App.2d 307, 315, 8 Cal.Rptr. 849.) Here, the record does not show affirmatively that the defendant effectively demanded the right to take the stand against the advice of his attorney, and the judgment, therefore, cannot be reversed on that ground." People v. Blye, 233 Cal.App.2d 143 at 149, 43 Cal.Rptr. 231 at 236 (1965).

In State v. Martin, supra, we also stated that our position in that case is "subject to the limitation that the defendant make his objection known at trial; not as an afterthought." 102 Ariz. at 147; 426 P.2d at 644. Defendant, not having made his objection known during his trial, will not now be heard to complain. We find no error here.

 Defendant's second argument is that the trial court erroneously allowed "cash register tapes, weakly corroborated," over defendant's objection to be used in supporting the state's contention that money was actually taken from the victim's cash register. We find no merit in this contention. The Uniform Business Records as Evidence Act, as adopted in Arizona, is embodied in both: A.R.S. § 12–2262 and Civil Rule 44, 16 A.R.S. Rules of Civil Procedure. Such civil rules of evidence apply to criminal actions as well. 17 A.R.S. Rules of Criminal Procedure, Rule 272.

Rule 44(q), Rules of Civil Procedure reads as follows:

"44(q) *Proof of business record; definition; as evidence.*

1. The term 'business' includes every kind of business, profession, occupation, calling or operation of institutions, whether or not carried on for profit.

2. Any record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

Under Rule 44(q), supra, the trial court has wide discretion in determining the admissibility of such business records. State v. Veres, 7 Ariz.App. 117, 436 P.2d 629 (1968), cert. denied 393 U.S. 1014, 89 S.Ct. 613, 21 L.Ed.2d 559; Builders Supply Corporation v. Shipley, 86 Ariz. 153, 341 P.2d 940 (1959). While the initial determination of admissibility is for the trial court its probative value is solely a matter for the jury to decide. The fact that the cash register tapes produced some conflicting testimony goes not to admissibility but rather to its weight. We therefore, find that no error was committed in admitting the cash register tapes. It might be noted that several witnesses had already testified to the following: (1) sales had been made during that partciular day; (2) there was money in the cash register prior to the alleged robbery; and (3) the cash register was found open and empty shortly after the defendant and his brother fled. The cash register tapes were, therefore, evidence to be considered by the trier of fact in determining whether or not, and how much, money was actually taken.

 Defendant's third contention is that the trial court committed reversible error in not ordering a hearing pursuant to Rule 250, Rules of Criminal Procedure 17 A.R.S., to determine his ability to understand the nature of the proceedings against him and to assist in his defense. We find little merit to this contention. This Court has repeatedly held that the initial determination, whether reasonable grounds exist to order a Rule 250 hearing, is left to the sound discretion of the trial judge, and the trial judge's decision will be upheld unless there has been a manifest abuse of that discretion. See: State v. Boag, 104 Ariz. 362, 453 P.2d 508 (1969); State v. Bradley, 102 Ariz. 482, 433 P.2d 273 (1967); State

v. McClendon, 101 Ariz. 285, 419 P.2d 69 (1966); State v. Reid, 87 Ariz. 123, 348 P.2d 731 (1960). By leaving the initial determination to the "sound discretion" of the trial judge does not mean that he is given "carte blanche" to rule as he pleases. On the contrary:

"* * * '[i]f the evidence adduced in support of a motion under Rule 250 is sufficient to give rise to a doubt in the mind of the court as to whether defendant is sane, it is the mandatory duty of the court to hold a hearing." State v. Bradley, supra, at 486, 433 P.2d at 277.

While the record reveals that defendant at times became somewhat emotionally strained, we do not feel that there was any such "manifest abuse of discretion" which would necessitate a reversal on this ground alone.

Defendant's fourth contention sets forth three reasons why the search warrant, under which certain incriminating evidence was seized, should have been declared invalid and the evidence obtained thereunder rendered inadmissible at his trial: (1) defendant was not provided with a receipt for property seized under the search warrant; (2) the search warrant was executed but not returned within the statutory ten day period; (3) the evidence was rendered inadmissible because of a statement made by defendant as to the location of his car prior to receiving the standard warnings as set forth in Miranda v. Arizona, supra.

■ While we agree with defendant that error was committed in both (1) and (2), supra, we cannot accept his contention that the search warrant was thereby rendered invalid. Even though defendant should have been given a detailed receipt listing all items seized, 5 A.R.S. § 13–1449; and the search warrant should have been returned within the statutory ten day period, 5 A.R.S. § 13–1451, these errors were not such as to render the search warrant invalid. In State v. Sherrick, 98 Ariz. 46, 402 P.2d 1 (1965), cert. denied 384 U.S. 1022, 86 S.Ct. 1938, 16 L.Ed.2d 1024, we held that failure to make inventory and return of the search warrant until approximately 60 days after issuance and execution thereof, instead of within the ten days allowed by statute, was not fatal in view of clear execution of the warrant within ten days. In the present case, while return was made shortly after the ten day statutory period, the warrant was executed well within the ten day period. We, therefore, hold the search warrant was valid.

■ Defendant claims in (3), supra, that the evidence seized should not have been admitted because he gave the location of his car prior to being given the *Miranda* warnings. The record indicates that defendant had spontaneously volunteered the information as to the location of his car. While defendant and his brother were being placed under arrest by two Utah police officers an Arizona highway patrolman pulled up and asked generally where their car was. He testified that he had not specifically directed the question to either of the Tillery brothers but merely was inquiring as to the whereabouts of the car, known to have been used in fleeing the scene of the crime. We do not believe that the evidence seized from defendant's auto should be excluded merely because defendant believed it wise to volunteer information that his car was "up the road aways." This fact was obvious since the defendant, when arrested, was walking away from the scene of the crime but towards the roadblock. The car had to be somewhere between the point of arrest and the scene of the crime. It was inevitable that the car would soon be found: the officers already had an accurate description of the escape vehicle and defendant had abandoned the car at the side of the highway in plain sight of passing traffic. For these reasons we hold that the trial court committed no error in allowing the state to introduce evidence seized from defendant's car under the search warrant.

■ Defendant's fifth and final contention is that a conviction may not be had on the testimony of an accomplice unless the accomplice's testimony is corroborated

by other independent evidence which, in itself and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense —5 A.R.S. § 13–139. We believe the evidence presented at defendant's trial was sufficient to corroborate his brother's testimony: (1) defendant was seen leaving the scene of the crime shortly before Mr. Baker was found unconscious and the robbery discovered; (2) the wrench used by defendant in inflicting the brutal beating was found hidden in defendant's car; (3) Federal Bureau of Investigation agents' testimony indicated that defendant's wrench had traces of blood and human hairs on it, matching those of Vern Baker; (4) defendant was found with an unusual amount of change on his person ($7.82) closely corresponding to the amount of change alleged to have been taken from the cash register. The evidence necessary to corroborate an accomplice's testimony need not be sufficient to establish the defendant's guilt. Evidence which tends, in only a slight degree, to implicate defendant is sufficient and the necessary corroboration may be established by circumstantial evidence alone. State v. Springer, 102 Ariz. 238, 428 P.2d 95 (1967); cert. denied 390 U.S. 926, 88 S.Ct. 859, 19 L. Ed.2d 986. Bearing this in mind we find no merit to this argument.

Judgment affirmed.

STRUCKMEYER, C. J., HAYS, V. C. J., and LOCKWOOD and CAMERON, JJ., concur.