489 P.2d 722

**The STATE of Arizona, Appellee,**

v.

**James Curtis ANDERSON, Appellant.**

**No. 2 CA–CR 259.**

Court of Appeals of Arizona, Division 2.

Oct. 12, 1971.

Rehearing Denied Nov. 10, 1971.

Review Denied Dec. 14, 1971.

Gary K. Nelson, Atty. Gen., Phoenix, by Jerry C. Schmidt, Asst. Atty. Gen., Tucson, for appellee.

Howard A. Kashman, Pima County, Public Defender, by Fredric F. Kay, Deputy Public Defender, Tucson, for appellant.

KRUCKER, Chief Judge.

This appeal raises two questions: (1) The validity of a seizure of marijuana, and (2) Whether the marijuana seized was a usable quantity and quality.

The defendant was found guilty, after a trial without a jury, of the offense of possession of marijuana and placed on probation for ten months, it being his first offense.

The facts are that a number of Tucson police officers proceeded to 4319 East Flower Street early in the morning of January 12, 1970. Two of the officers (White and Etzwiller) went to the front door of Apartment B at that address and one of them knocked on the door. The defendant opened the door and the officers asked him if he rented the premises. He said he did. The officers told him they had received information that two juveniles, who were runaways, were in the house. Defendant told the officers that there were two girls from California inside. One of the officers asked the defendant if they could come inside and defendant agreed to let them in and opened the door for them.

In the meantime, Officer Max Davis had stationed himself at the rear of this apartment in such a manner that he could see inside the apartment. There were several other officers outside the house—some in front and some to the rear. Through an open window Officer Davis heard what took place at the front door, saw the two officers who were asked to come in, and saw and heard what took place inside after the lights were turned on. The two officers inside identified the two runaways and, when Officer Davis saw this he proceeded to the front of the house and went in through the front door "to see if I [Davis] could assist in the paperwork. * * *" The front door was open and the screen door was ajar as he entered.

Officer Davis stopped just inside the front door and listened to the conversation taking place. At this point he noticed a bottle which contained what appeared to be seeds, as well as a certain plant-life in two small plastic containers with dirt in them. Officer Davis informed Officer White of this fact and pointed out what he had seen. These items were on the kitchen table and beside it. They were taken by the police officers to the police department property room, tagged and turned in.

The defendant was advised of his constitutional rights to counsel and not to incriminate himself and he waived these rights. At this point, the defendant stated that it had taken four months to grow the plant depicted by the photograph which was State's Exhibit 2. This plant was about one foot tall.

Upon being subjected to the Duquenois test, this plant gave a positive reaction for marijuana. A criminalist for the Tucson—Pima County Crime Laboratory testified that upon close examination she determined the plant to be a young marijuana plant. Microscopic examination revealed that the plant did not have claw-like, cystolithic hairs. The criminalist testified that these hairs were undeveloped. She testified that she examined the seeds under a microscope and performed the Duquenois test on them, with a positive reaction, and that in her

opinion they were marijuana seeds, one of which sprouted under laboratory conditions (out of twenty tested).

■ As to the seizure, it resulted from the observation by a police officer who entered the apartment after the first two police officers were permitted by the defendant to enter. To find a valid consent to search or to enter a residence there must be:

"'* * * clear and positive evidence in unequivocal words or conduct expressing consent, and it must be established that there was no duress or coercion, actual or implied. [Citation omitted.]'" State v. Sherrick, 98 Ariz. 46, 54, 402 P.2d 1, 7 (1965), cert. denied, 384 U.S. 1022, 86 S.Ct. 1938, 16 L.Ed.2d 1024 (1966), quoting from State v. Kananen, 97 Ariz. 233, 399 P.2d 426 (1965).

Our Supreme Court has more recently cited *Sherrick* with approval as to their proposition in State v. Sherron, 105 Ariz. 277, 279, 463 P.2d 533 (1970). Here, the evidence was of the requisite nature to prove consent to enter the apartment.

Once the first two officers had been legally admitted to the premises, neither a later nor contemporaneous entry can be questioned. Russo v. United States, 391 F.2d 1004 (9th Cir. 1968), cert. denied, 393 U.S. 885, 89 S.Ct. 195, 21 L.Ed.2d 161 (1968); Vanella v. United States, 371 F.2d 50 (9th Cir. 1966), cert. denied, 386 U.S. 920, 87 S.Ct. 883, 17 L.Ed.2d 790 (1967). Once lawfully inside, as we hold Officer Davis to have been, a police officer "'who, from this location, can, by the mere act of looking, observe what he believes to be contraband, is * * * not required to close (his) eyes and need not walk out and leave the article where (he) saw it.' Davis v. United States, 327 F.2d 301, 305 (9th Cir. 1964)." State v. Pine, 8 Ariz.App. 430, 434, 446 P.2d 940, 944 (1968), cert. denied, 395 U.S. 962, 89 S.Ct. 2103, 23 L.Ed.2d 747 (1969). Also, "when during * * * a

lawful search for goods illegally possessed, the searching officers discover legal evidence of possession of other goods, the possession of which is unlawful, the discovered goods may be seized. [Citation omitted]." State v. McMann, 3 Ariz.App. 111, 114, 412 P.2d 286, 289 (1966). Clearly, a police officer legally inside a dwelling may seize whatever illegally possessed items he observes. This is not a search but simply a lawful seizure. State v. Curtis, 10 Ariz.App. 38, 455 P.2d 988 (1969). Also, an officer may testify about what he observes "in open view" while securing a premises. State v. Lenahan, 12 Ariz.App. 446, 452, 471 P.2d 748 (1970). The seizure was valid, particularly under the facts here, in that the officer merely entered the premises "to assist in the paperwork. * * *" Probably a more compelling reason for upholding this search is the possible danger to police officers inherent in a situation with two police officers inside a small apartment with five other people. Courts must be careful not to prohibit police officers from taking necessary steps in protecting themselves and their colleagues.

■ As to the question of whether the marijuana seized was of a usable quantity and quality, defendant's only witness was Dr. Cornelius Steelink, a chemistry professor at the University of Arizona, whose main field of research had been plant chemistry and the branch of that field known as physiochemistry (the chemistry of flowering plants) since 1953. Dr. Steelink testified that the Duquenois test used by the criminalist here (accurately according to Dr. Steelink) gives a positive reaction on testing approximately 15 compounds called cannabinols, which occur in the species cannabis sativa, or marijuana. But Dr. Steelink testified that of these cannabinols only six, called tetrahydrocannabinols, had a psychotropic or hallucinogenic effect on human beings and that the Duquenois test was not conclusive for these compounds.[1] He testified that the Du-

---

1. Dr. Steelink testified that there are two other ingredients of the resin of marijuana which give an hallucinogenic effect upon being heated to the temperature of a smoking cigarette in that they turn into tetrahydrocannabinols.

quenois test did not isolate the two other compounds which turn into tetrahydrocannabinols (see note 1, supra). He also testified that neither tetrahydrocannabinols nor the two compounds which turned into tetrahydrocannabinols (see note 1 supra) were found in immature marijuana plants and that no tetrahydrocannabinols were found in marijuana seeds, but he declined to testify whether the plant here (State's Exhibit 2) was a mature or immature plant because he is not a botanist. Upon cross-examination the defendant's witness admitted he had never seen a growing marijuana plant and knew none of the gross characteristics of marijuana. He stated he could not identify it by sight.

The thrust of defendant's argument is that the plant here was immature, contained no tetrahydrocannabinols and, therefore, was not of a sufficient " *'quantity and quality to be susceptible of use as a narcotic.* * * *'*" (Emphasis in original) State v. Moreno, 92 Ariz. 116, 120, 374 P.2d 872, 875 (1962).

The defendant urges that the thin layer chromatography test should have been used here rather than the Duquenois test in that the former test was necessary to determine which of the fifteen cannabinols were present in the plant here. In that way, defendant contends, it could have been determined whether the plant contained active compounds.[2]

The defendant's contention would apparently have had merit under State v. Haddock, 101 Ariz. 240, 418 P.2d 577 (1966), which held that one cannot be convicted for possession of marijuana seeds, relying on State v. Curry, 97 Ariz. 191, 398 P.2d 899 (1965). The statute in effect at the time of that case, A.R.S. § 36–1002, prohibited possession of narcotic drugs, which were defined by A.R.S. § 36–1001, subsec. 14 as including "cannabis," which was defined by A.R.S. § 36–1001, subsec. 13. The

definition of cannabis in A.R.S. § 36–1001, subsec. 13 has been amended since *Haddock* and *Curry,* and now reads:

\* \* \* \* \* \*

"13. 'Cannabis' includes the following substances under whatever names they may be designated:

(a) Marijuana.

(b) All parts of the plant cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant, and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds, or resin, but shall not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

(c) The resin extracted from such tops.

(d) Every compound, manufacture, salt, derivative, mixture or preparation of such resin, tetrahydrocannabinol (T.H.C.), or of such tops from which the resin has not been extracted."

Under this definition, possession of the seeds and growing plants of cannabis sativa L. is prohibited without distinction as to their content of active compounds.[3] This is a valid exercise of the police power in that prohibition of possession of these parts of this specie bears a reasonable relation to the protection of the public health, safety, welfare and morals. Gear v. City of Phoenix, 93 Ariz. 260, 379 P.2d 972 (1963). The proof here, consisting of the gross examination of the plant, the microscopic examination of the seeds and the positive

---

2. The active compounds, as explained above, are the tetrahydrocannabinols and the two compounds which turn into tetrahydrocannabinols upon heating (see note 1, supra).

3. See notes 1 and 2, supra.

Duquenois test on both, is that these items were the prohibited material and of a usable quantity and quality.

Affirmed.

HATHAWAY and HOWARD, JJ., concur.