906 P.2d 579

STATE of Arizona, Appellee,

v.

David GULBRANDSON, Appellant.

No. CR–93–0085–AP.

Supreme Court of Arizona,
En Banc.

Nov. 2, 1995.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, Colleen L. French, Assistant Attorney General, Phoenix, for Appellee.

Jan J. Raven, Phoenix, for Appellant.

### OPINION

CORCORAN, Justice.

Appellant David Gulbrandson (defendant) was convicted of premeditated first-degree murder and theft. He was sentenced to consecutive sentences of death on the murder conviction and the presumptive term of 5 years on the theft conviction. This automatic appeal followed. *See* A.R.S. § 13–4031; rules 26.15, 31.2(b), & 31.15(a)(3), Arizona Rules of Criminal Procedure. Defendant also filed a separate notice of appeal of the conviction and sentence on the theft charge. We have jurisdiction pursuant to article 6, § 5(3) of the Arizona Constitution and A.R.S. §§ 13–4031 to –4033. We affirm defendant's convictions and sentences.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. *Facts*

In 1990, defendant and the victim, Irene, became partners in a photography business known as Memory Makers, which they operated out of Irene's home. For about one year, during 1990, Irene and defendant were also romantically involved. Defendant lived with Irene and her two children until January 1991 when Irene asked him to move out. He leased his own apartment on February 1, 1991.

After the romantic relationship ended, the business relationship continued, but defendant suspected that Irene was trying to steal the business from him. Irene did in fact wish to sever the business relationship and wanted to "buy out" defendant by paying him for his proportionate share of the business. From about January to March 1991, Irene resumed dating Evan Shark, with whom she had been involved before her relationship with defendant.

On February 14, 1991 (Valentine's Day), defendant became intoxicated and argued with Irene about the business in the presence of two friends, Sally and Charles Maio. Defendant tried to strangle Irene, and Charles Maio had to pull defendant off of her. Later, when the Maios drove defendant home, defendant said, "I'm going to kill her [Irene]. I'm going to kill the business. I'm going to kill everything." Irene filed a petition complaining about the incident and obtained an injunction prohibiting harassment, which was an order from the court prohibiting defendant from having any contact with Irene and from going to her residence. A police assistant testified at trial that when she served defendant the injunction on February 27, 1991, defendant "called [Irene] a bitch."

Irene traveled to New Mexico on business the weekend of March 8, 1991, accompanied by Evan Shark, to sell photographs by Memory Makers. She returned on Sunday, March 10, about 7:00 p.m. with cash and checks from the business trip. Mr. Shark returned to his home in Las Vegas, Nevada.

The next morning, Monday, March 11, 1991, Irene's daughter went to her mother's bedroom to awaken her and found the bedroom door locked. Her daughter knocked on the door but heard no response; she then noticed a dark stain on the wall leading to her mother's bedroom. Suspecting that something was wrong, the daughter telephoned her grandmother who called the police. The police found Irene dead in the bathroom adjacent to her bedroom, and her car, a 1987 Saab Turbo, was missing. Two of her three children were home the evening of March 10 but apparently did not hear anything suspicious.

Irene was killed brutally. The police found her face down dressed in only a pair of panties with her legs bent up behind her at the knee and her ankles tied together by an

electrical cord attached to a curling iron. Her right wrist was bound with an electrical cord attached to a hair dryer. Her bedroom was covered in what appeared to be blood. From the bedroom to the bathroom were what appeared to be drag marks in blood. Clumps of her hair were in the bedroom; some of the hair had been cut, some burned, and some pulled out by the roots.

Four knives and a pair of scissors were in the kitchen sink and appeared to have blood on them; hair appeared to be on at least one of the knives. There also was what appeared to be blood on a paper towel holder in the kitchen; a burnt paper towel was in Irene's bedroom. A Coke can with what appeared to be a bloody fingerprint on it was on the kitchen counter; this fingerprint was later identified as defendant's. At trial, the state's criminalist testified that the knives, scissors, paper towel holder, and Coke can had human blood on them, although the police did not determine the blood type. Defendant's fingerprints were found on the paper towel holder and on an arcadia door at Irene's home, which was open in the family room the morning after the crime. A blood-soaked night shirt with holes in it was in Irene's bedroom; the blood on the nightshirt was consistent with Irene's blood type. A banker's bag was also in her bedroom with what appeared to be blood on it.

The autopsy revealed that Irene suffered at least 34 sharp-force injuries (stab wounds and slicing wounds), puncture wounds, and many blunt force injuries. The most serious stab wound punctured her liver, which alone was a fatal injury. Her nose was broken, as were 2 ribs on the back of the chest and 5 ribs in front on the same side of her trunk. The tine from a wooden salad fork was embedded in her leg; a broken wooden fork was found in the bedroom. On her left buttock was an abrasion that appeared to be from the heel of a shoe. The thyroid cartilage in front of her neck was fractured, which could have been caused by squeezing or by impact with a blunt object. She died from the multiple stab wounds and the blunt neck injury. The neck injury may have resulted in asphyxiation. The pathologist believed that most, if not all, of the injuries were inflicted before death.

The police immediately suspected defendant. Police officers set up a surveillance of his apartment. Having observed no one entering or leaving the apartment, police officers conducted a "check-welfare" sweep of the apartment at about 3:00 p.m. on March 11, because they were concerned that defendant might have been injured in the struggle with Irene. The officers knocked on the door, announced their identity, and entered the apartment with a pass key after hearing no response. They searched briefly for defendant, but he was not inside. While making the sweep, an officer saw some apparently blood-splattered papers on the kitchen counter and a jacket apparently stained with blood hanging on the back of a kitchen chair.

Early in the evening of March 11, defendant called his mother, Dorothy Riddle, and told her that "he thought he had done a terrible thing. He thought he had killed Irene." Defendant also said that he was going to kill himself. Ms. Riddle called the police and told them about this conversation.

The police obtained a warrant to search defendant's apartment and did so at about 8:20 p.m. on March 11. The police found checks from New Mexico, payable to Memory Makers, and other business papers relating to Memory Makers; black clothing (shoes, shirt, pants, and a jacket); and a business card in the back pocket of the black pants. All these items had human blood on them consistent with Irene's blood type. The police also found a credit card of Irene's in the pocket of the black jacket.

Witnesses saw defendant gambling in Laughlin, Nevada, in the early morning of Tuesday, March 12, 1991. Defendant told casino employees that his name was David Wood. The casino offered, and defendant accepted, a free room for the day because defendant had played for several hours and lost between $1,100 and $1,200.

Defendant had attempted to sell Irene's car to a bar owner in Great Falls, Montana, but the bar owner refused, in part because defendant could not produce a title to the car. Defendant did sell a cellular phone

from the car to the bar owner. On April 1, 1991, a police officer in Montana found Irene's car abandoned with Canadian license plates attached; the officer found an Arizona license plate under the driver's seat. The police apprehended defendant in Montana on April 3, 1991.

## B. *Procedural Background*

On April 17, 1991, defendant was indicted in Maricopa County for first-degree murder and theft.

Defendant's counsel requested a rule 11 competency examination, which was denied after a pre-screening report was prepared. The trial court granted defendant's request for a neurological examination (CAT scan) because of a prior head injury.

Defendant presented at trial the defenses of insanity and lack of intent. At no time did defendant allege the defense of self-defense. Martin Blinder, M.D., defendant's psychiatric expert who performed an evaluation of defendant, testified about defendant's abusive childhood, history of depression and alcoholism, past psychiatric treatment, and past history of familial, financial, and personal failure. He further testified to 4 diagnoses of defendant's psychiatric condition: dissociative episode and fugue state, bipolar disorder, alcoholism, and personality disorder. The trial court sustained the state's objections to any testimony regarding defendant's mental state at the time of the offense because Dr. Blinder could not testify that defendant was *M'Naghten* insane.[1]

Defendant's sisters, Edith Klemp and Paula Famularo, both testified regarding defendant's poor relationship with his father and prior mental problems. They both testified that if defendant murdered Irene, he did not know what he was doing, nor did he understand the consequences of his act.

The state called in rebuttal Alexander Don, M.D., and John Scialli, M.D., who both performed psychiatric evaluations of defendant. Dr. Don testified that defendant told him that the last memory defendant had before Irene's murder was going to her home that night to get a key to his apartment because he had locked himself out. Defendant further told Dr. Don that he remembered talking to Irene in the kitchen and that she had thrown a pair of scissors at him. The next thing defendant said he remembered was driving through Wickenburg and then to Laughlin to gamble. Defendant said he saw a report about Irene's murder on television and only then believed he had committed the crime.

Dr. Don testified that defendant was not *M'Naghten* insane at the time of the killing. Further, he testified that a person's ability to remember an incident has nothing to do with that person's knowledge regarding what he was doing while he was doing it. Dr. Scialli also testified that in his opinion defendant was legally sane at the time of the alleged offense because defendant knew the nature and quality of his acts and the difference between right and wrong. Dr. Scialli testified that the results of the CAT scan were normal.

The jury was instructed on premeditated first-degree murder, second-degree murder, manslaughter, the insanity defense, and the theft charge. Defendant did not raise the defense of self-defense or request a self-defense instruction, and the jury was not instructed on felony murder. The jury convicted defendant of premeditated first-degree murder and theft of property having a value of a minimum of $8,000.

After conducting an aggravation/mitigation hearing, the trial court sentenced defendant to death, finding that he had committed the murder in an especially heinous or depraved manner. The trial court found that defendant failed to prove by a preponderance of the evidence that his capacity to appreciate the wrongfulness of his conduct or to con-

---

1. The test for insanity under former A.R.S. § 13–502(A) was whether the defendant at the time he committed the act "was suffering from such a mental disease or defect as not to know the nature and quality of the act" or, in the alternative, the defendant did not know that what he was doing was wrong. This is known as the *M'Naghten* test, and the defendant must prove insanity by clear and convincing evidence. *State v. Hudson*, 152 Ariz. 121, 125, 730 P.2d 830, 834 (1986). In 1993 the legislature revised the insanity defense statute. *See* A.R.S. § 13–502(A), Laws 1993, Ch. 256, § 3.

form his conduct to the requirements of the law was significantly impaired, but not so impaired as to constitute a defense to prosecution. The trial court found that defendant proved by a preponderance of the evidence that "he was under unusual *stress.*" *See* A.R.S. § 13–703(G)(2). The trial court also found several non-statutory mitigating circumstances but concluded that the mitigating circumstances were not sufficiently substantial to call for leniency.

The trial court ordered that defendant's 652 days of presentence incarceration time be split between the sentences of death for the murder and 5 years for the theft, and that the sentences be served consecutively.[2]

## II. ISSUES

We address the following issues in this appeal:

### *Trial Issues*

1. Whether the trial court erred in death-qualifying the prospective jurors.

2. Whether the trial court erred in denying defendant's motion to suppress evidence seized from his apartment.

3. Whether the trial court erred in limiting the testimony of defendant's mental health expert regarding defendant's state of mind at the time of the murder.

4. Whether the trial court abused its discretion by allowing the admission of gruesome photographs of the victim, the crime scene, and the autopsy.

5. Whether the trial court abused its discretion by allowing the admission of evidence, pursuant to rule 404(b), Arizona Rules of Evidence, regarding defendant's prior assault on the victim.

6. Whether defendant was deprived of the right to a fair trial because some

state's witnesses referred to untested substances as "blood," rather than as substances that "appeared to be blood."

7. Whether the prosecutor violated rule 15.1(a)(7), Arizona Rules of Criminal Procedure, by failing to disclose an inconsistent statement of a witness.

8. Whether the prosecutor violated rule 9.3, Arizona Rules of Criminal Procedure, by advising state's witnesses before they testified about the manner of the victim's death.

9. Whether the trial court had a *sua sponte* duty to make an on-the-record inquiry as to the waiver of defendant's right to testify.

10. Whether the state failed to prove premeditation beyond a reasonable doubt.

### *Sentencing Issues*

1. Whether defendant should be resentenced before a different judge because the trial court heard victim statements regarding opinions as to the appropriate sentence.

2. Whether defendant's rights to due process and a fair and reliable capital sentencing were violated because the trial court held a joint sentencing hearing on the noncapital and capital offenses.

3. Whether the death penalty was the appropriate sentence.

4. Whether the Arizona death penalty statute as written and applied is constitutional.

## III. DISCUSSION

### A. *Trial Issues*

### 1. Death Qualification of Jury

All potential jurors in this case completed a written questionnaire, which included the

---

2. The trial judge undoubtedly credited part of the incarceration time against the death sentence on the theory that the death sentence could at some future time be reduced to a life sentence without possibility of release until the completion of service of 25 years. *See* A.R.S. § 13–703(A); *see also Tittle v. State,* 169 Ariz. 8, 9, 816 P.2d 267, 268 (App.1991) (defendant originally *sentenced* to death on first-degree murder conviction; conviction reversed and defendant later convicted of second-degree murder; trial court credited time

spent on death row to sentence on second-degree murder); *State v. Cuen,* 158 Ariz. 86, 88, 761 P.2d 160, 162 (App.1988) (holding that "A.R.S. § 13–709(C) requires that credit for incarceration pursuant to a vacated sentence be given against a new sentence imposed after a former sentence was vacated," but that defendant does not receive double credit for presentence incarceration time when consecutive sentences imposed).

following question: "Do you have an opinion about the death penalty? yes no If so, explain." As a result of the answers to that question and to the judge's question whether their "conscientious or religious scruples or feelings ... would prevent [them] from voting on First Degree Murder because of the possible imposition of the death penalty," some jurors were excused. After excusing these jurors, the court asked again whether any of the jurors' "feelings about the death penalty" would interfere with their ability to reach an impartial decision about the case. None of the remaining jurors responded affirmatively.

Defendant argues that these questions violated his right to an impartial jury under the Sixth and Fourteenth Amendments of the United States Constitution and article 2, § 24 of the Arizona Constitution. He argues that the questions resulted in the elimination of an impartial cross-section of the community, a jury more likely to consider defendant's failure to testify as an indication of guilt, and a jury more distrustful of defense attorneys and less concerned with the danger of erroneous conviction. *But see Lockhart v. McCree*, 476 U.S. 162, 173–78, 106 S.Ct. 1758, 1764–67, 90 L.Ed.2d 137 (1986) (holding that there is no "fair cross-section" requirement for petit juries and that "death qualification" of jurors serves the state's legitimate interest in obtaining a jury that can properly and impartially apply the law to facts of the case).

Further, defendant argues that because the jury does not impose the death sentence in Arizona, death qualification serves no legitimate interest. *But see State v. Sparks*, 147 Ariz. 51, 54–55, 708 P.2d 732, 735–36 (1985) (sustaining death qualification).

■ Defendant did not object to the trial court's questioning of the prospective jurors. In fact, defendant requested such questions. Therefore, defendant has waived this issue on appeal, absent a finding of fundamental error. *State v. Herrera*, 176 Ariz. 9, 15, 859 P.2d 119, 125, *cert. denied*, —— U.S. ——, 114 S.Ct. 446, 126 L.Ed.2d 379 (1993). Death qualification of the jury in this case was not fundamental error. *See State v. Schaaf*, 169 Ariz. 323, 331, 819 P.2d 909, 917 (1991) (holding that

questioning prospective jurors about their position on the death sentence is permissible to determine whether jurors can perform their duties); *see also State v. West*, 176 Ariz. 432, 439–40, 862 P.2d 192, 199–200 (1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994).

### 2. Motion to Suppress Evidence Seized from Defendant's Apartment

Defendant moved to suppress all evidence seized from his apartment during the March 11 search conducted pursuant to a warrant because the earlier entry into the apartment was warrantless, and the affidavit the police submitted to obtain the search warrant referred to items seen during the warrantless entry. In response, the state contended that the police had substantial information justifying the issuance of a warrant independent of the warrantless entry, and that the police had decided to procure the search warrant before making the warrantless entry. The court denied the motion to suppress.

The trial court held, and both parties here agree, that the initial warrantless entry into defendant's apartment to conduct a check-welfare sweep was unlawful. Defendant argues that the subsequent search pursuant to a warrant violated his rights against unreasonable search and seizure. *See* U.S. Const. amend. IV; Ariz. Const. art. 2, § 8; *State v. Main*, 159 Ariz. 96, 99, 764 P.2d 1155, 1158 (App.1988) (upholding suppression of evidence seized pursuant to protective sweep).

■ The trial court's ruling on the motion to suppress should not be reversed on appeal, absent clear and manifest error. *State v. Stanley*, 167 Ariz. 519, 523, 809 P.2d 944, 948 (1991). We hold that the trial court correctly found this evidence admissible under the independent source doctrine. *See Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984); *see also Murray v. United States*, 487 U.S. 533, 536–41, 108 S.Ct. 2529, 2533–35, 101 L.Ed.2d 472 (1988) (holding that evidence observed in plain view during illegal entry does not have to be suppressed if search warrant obtained later based on information from independent sources); *Segura v. United States*, 468 U.S.

796, 813–14, 104 S.Ct. 3380, 3390, 82 L.Ed.2d 599 (1984) (holding that suppression not mandated because search warrant issued based on information obtained by police before illegal entry).

The basic premise of the independent source doctrine is that the police should not be placed in a worse position than they would have been in, absent the illegal conduct. *Nix,* 467 U.S. at 443–44, 104 S.Ct. at 2508–09. "[T]he products of a subsequent search under warrant may be admitted at trial, provided the warrant was based on information legally obtained." *State v. Martin,* 139 Ariz. 466, 477, 679 P.2d 489, 500 (1984); *see also State v. Ault,* 150 Ariz. 459, 466, 724 P.2d 545, 552 (1986) (holding that evidence seized during illegal search must be suppressed but that other evidence seized later pursuant to search warrant was admissible).

Two Arizona cases are closely analogous to the situation here. In *State v. Ault,* the court declined to apply the inevitable discovery doctrine in that factual situation based on a violation of Arizona's right to privacy provision—article 2, § 8 of the Arizona Constitution ("No person shall be disturbed in his private affairs, or his home invaded, without authority of law."). 150 Ariz. at 465–66, 724 P.2d at 551–52. In that case, the police entered the defendant's home to arrest the defendant without an arrest warrant or search warrant. *Ault,* 150 Ariz. at 462, 724 P.2d at 548. While in the defendant's home, the police seized a pair of muddy shoes that incriminated the defendant. *Ault,* 150 Ariz. at 462, 724 P.2d at 548. The police had intended to arrest the defendant before seeing the shoes. The police later obtained a search warrant for the defendant's home. *Ault,* 150 Ariz. at 462, 724 P.2d at 548. *Ault* emphasized the stronger protection afforded by our state constitution's right to privacy provision and held that the "shoes seized should have been suppressed as primary evidence obtained as a direct result of police

misconduct." 150 Ariz. at 466, 724 P.2d at 552. However, *Ault* also held that evidence seized pursuant to the search warrant was properly admitted, relying on *State v. Martin. Ault,* 150 Ariz. at 466, 724 P.2d at 552.

In *Martin,* as in this case, the police made a warrantless entry into the defendant's home and conducted a "protective sweep." 139 Ariz. at 470, 679 P.2d at 493. The police then obtained a search warrant, and no items were seized from the house until after the search warrant was issued. *Id.* In *Martin,* the court held that "products of a subsequent search may be admitted at trial, provided the warrant was based on information legally obtained." 139 Ariz. at 477, 679 P.2d at 500.

Here, as in *Martin,* no evidence was seized until after the search warrant was issued. The information learned during the initial unlawful entry was included in the search warrant, along with other information from independent sources. The proper method for determining the validity of the search, which the trial court used, is to excise the illegally obtained information from the affidavit and then determine whether the remaining information is sufficient to establish probable cause. In addition, the state must show that information gained from the illegal entry did not affect the officer's decision to seek the warrant or the magistrate's decision to grant it. *See People v. Koch,* 209 Cal.App.3d 770, 257 Cal.Rptr. 483, 485 (1989).

The trial court noted that the affidavit for the search warrant contained substantial information from independent sources supporting probable cause: (1) defendant's phone calls to the victim on March 10, (2) defendant's threatening phone calls to the victim's daughter the weekend before the murder when her mother was in New Mexico,[3] (3) defendant's previous assault on the victim, (4) defendant's absence, and (5) defendant's mother's report to the police that she had received a phone call from him in which he

3. The affidavit contains information from Irene's friend, Andy Smith, and from Irene's daughter, Jennifer, regarding phone calls that defendant allegedly made to Irene the night of the murder. Andy Smith and Jennifer both told the police that defendant called three times the night of March 10 and that her mother refused to speak to him and told him not to call back. Jennifer also told police that defendant had called while Irene was away that weekend and "was angry" that Irene was selling his photographs. Neither Andy Smith nor Jennifer testified at trial regarding these phone calls.

said he thought he had killed Irene. Furthermore, the trial court found that the detective's intent to seek the warrant was formed before the first illegal entry into defendant's apartment. We conclude that the trial court did not abuse its discretion by denying the motion to suppress.

### 3. Limit on Testimony of Defendant's Medical Expert Regarding Defendant's State of Mind at the Time of the Murder

The state moved to limit the testimony of defendant's mental health expert, Dr. Blinder. The state argued that Dr. Blinder's testimony should be limited to a discussion of defendant's general personality traits, and that he should not be allowed to testify regarding defendant's mental state at the time of the offense. The trial court ruled that if defendant presented lay or expert testimony indicating that defendant was *M'Naghten* insane at the time of the murder, then testimony about his character traits indicating his ability to form specific intent at the time of the offense would be admissible. Otherwise, such evidence would be limited to his general tendencies, and expert testimony concerning his mental state at the time of the offense would be precluded.

Two lay witnesses, defendant's sisters, testified that defendant was *M'Naghten* insane at the time of the murder. Defendant's mother testified that defendant was under great stress around the time of the murder and that she had been trying to get defendant into some type of mental treatment.

The trial court did not allow defendant's mental health expert to testify about defendant's mental state at the time of the crime because that expert could not testify that defendant was *M'Naghten* insane. Dr. Blinder testified that defendant had a "mental disability." Dr. Blinder further testified that defendant might react to stressful situations by experiencing dissociative episodes or fugue states; he also testified that, if defendant were involved in an argument while under stress and an object were thrown at him, defendant might dissociate, lose control, and act violently, and that in such a situation,

defendant would find it difficult to "calculate a plan."

Defense counsel did not make an offer of proof as to what Dr. Blinder might have said regarding defendant's mental state at the time of the murder. The trial court sustained the state's objections to questions that elicited a response from Dr. Blinder regarding defendant's mental condition at the time he committed the crime. For example, the state objected when Dr. Blinder started to say, "it is likely that he was in a dissociative—." The trial court did allow Dr. Blinder to testify in a hypothetical form, however, by allowing him to answer questions such as, "What would you expect his reaction might be in a situation where he was under a high degree of stress and there was a quarrel or argument and an object was thrown at him?" Dr. Blinder was allowed to testify regarding defendant's general personality traits and how he thought defendant might react in a certain situation.

Defendant did not properly preserve this issue for appeal because his counsel failed to make an offer of proof. We do not know what Dr. Blinder might have said. Therefore, we do not reach the issue whether the trial court abused its discretion by excluding testimony regarding defendant's state of mind at the time of the offense. We note that there was overwhelming evidence of premeditation and that the trial court gave Dr. Blinder wide latitude to testify generally about defendant's mental condition.

### 4. Gruesome Photographs

Defendant objected to the admission of photographs of the victim at the crime scene and of the autopsy. The trial court granted his motion as to 5 of the photographs, finding them cumulative. The trial court allowed the admission of the remaining photographs, holding that they were relevant to show the nature, extent, and location of Irene's injuries, to illustrate the pathologist's testimony, to show the scene, and to show the manner in which the offense was committed. The court further found that, although the photos were "inflammatory and gruesome," the probative value was not substantially outweighed by the danger of unfair prejudice. Defendant

moved for a new trial based on the admission of these photos, and the trial court denied the motion.

Defendant argues that the cumulative effect of the admission of 10 such photos was to inflame the jury. Defendant argues that one photo of the victim's face was, by itself, so unduly prejudicial that it mandates retrial. Furthermore, defendant notes that the state made no effort to minimize the effect of the photos by covering extraneous areas of the photos. *See State v. Fulminante,* 161 Ariz. 237, 246–47, 778 P.2d 602, 611–12 (1988), *aff'd,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). And finally, defendant notes that the trial court itself stated that the prosecutor unnecessarily showed the photos to the jury repeatedly and described the prosecutor's manner of questioning as "truly gruesome."

 A trial court's ruling on admissibility of photographs will not be overturned on appeal absent an abuse of discretion. *State v. Amaya-Ruiz,* 166 Ariz. 152, 170, 800 P.2d 1260, 1278 (1990). A trial court's denial of a motion for a new trial is also reviewed under an abuse of discretion standard. *State v. Rankovich,* 159 Ariz. 116, 121, 765 P.2d 518, 523 (1988). The test for admission of photographs is two-part: (1) whether the photo is relevant to an issue in the case, and (2) whether the photo has a tendency to incite or inflame the jury. *Amaya-Ruiz,* 166 Ariz. at 170, 800 P.2d at 1278. If inflammatory, the trial court weighs the probative value against the prejudicial effect. Rule 403, Arizona Rules of Evidence; *State v. Lopez,* 174 Ariz. 131, 138, 847 P.2d 1078, 1085 (1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 258, 126 L.Ed.2d 210 (1993); *State v. Chapple,* 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983).

 Photos of a murder victim are relevant, even if a defendant offers to stipulate to the cause and manner of death, if the photos show important aspects of the crime scene to illustrate what occurred. *Amaya-Ruiz,* 166 Ariz. at 171, 800 P.2d at 1279. These photos were not cumulative and were relevant to show the cause and manner of Irene's death, to prove premeditation, and to illustrate the pathologist's testimony. Al-

though gruesome, their probative value was not substantially outweighed by the danger of unfair prejudice. Further, the defense did not suggest to the trial court any techniques for lessening the effect of the photos by covering extraneous areas of the photos. The trial court did not abuse its discretion by permitting the admission of these photos, nor did it abuse its discretion by denying defendant's motion for a new trial. *See, e.g., State v. Castaneda,* 150 Ariz. 382, 391–92, 724 P.2d 1, 10–11 (1986) (holding that trial court did not abuse its discretion by admitting photos of murder victim).

### 5. Evidence of Prior Assault on Victim, Admitted Pursuant to Rule 404(b), Arizona Rules of Evidence

The trial court allowed the admission of evidence, over defendant's objection, regarding his previous assault on Irene, finding that it was relevant to the issues of intent and premeditation. The defense argues that this incident was different from the murder because defendant was intoxicated during the earlier incident, but not while committing the murder. Defendant argues that admission of this evidence was unduly prejudicial, and, accordingly, defendant's conviction should be reversed. *See* U.S. Const. amend. VI; Ariz. Const. art. 2, § 24; *Michelson v. United States,* 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168 (1948).

 Admission of rule 404(b) evidence is reviewed under an abuse of discretion standard. *State v. Robinson,* 165 Ariz. 51, 56, 796 P.2d 853, 858 (1990). Four factors control the admission of evidence of prior acts: (1) the evidence must be admitted for a proper purpose, pursuant to rule 404(b), (2) the evidence must be factually or conditionally relevant, pursuant to rule 402 as enforced through rule 104(b), (3) the trial court may exclude the evidence if its probative value is substantially outweighed by the danger of unfair prejudice, pursuant to rule 403, and (4) the objecting party must have the opportunity to receive a limiting instruction if requested, pursuant to rule 105. *Huddleston v. United States,* 485 U.S. 681, 691, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988); *State v.*

*Atwood,* 171 Ariz. 576, 638, 832 P.2d 593, 655 (1992), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993); *see also State v. Schurz,* 176 Ariz. 46, 51–52 nn. 2–3, 859 P.2d 156, 162–63 nn. 2–3, *cert. denied,* —— U.S. ——, 114 S.Ct. 640, 126 L.Ed.2d 598 (1993).

■■■ First, this evidence of the previous assault was admitted for a proper purpose because it tended to prove that defendant premeditated Irene's death. *State v. Jeffers,* 135 Ariz. 404, 418, 661 P.2d 1105, 1119 (1983). Rule 404(b) states that evidence of other crimes, wrongs, or acts is not admissible to prove that defendant has a propensity toward crime, but such evidence may be admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Defendant argues that the evidence of the previous assault was inadmissible because it was not similar to the murder. However, the other crime proved by the proffered evidence must be similar to the offense charged only if similarity of the crimes is the basis for the relevance of the evidence. "Relevant evidence is not to be excluded because it fails to meet a similarity requirement." *United States v. Riggins,* 539 F.2d 682, 683 (9th Cir.1976).

Here, the evidence is relevant, not because the previous assault is similar to the charged offense, although there are many similarities, but because the previous assault shows motive and intent. Defendant assaulted and tried to strangle Irene less than one month before the murder. The fact that he was intoxicated during that previous assault does not render it too dissimilar to the murder to be relevant.

Second, this evidence was factually relevant because the state presented sufficient evidence from which the jury could determine that defendant did the other act in question. The state presented the testimony of two witnesses who saw the previous assault, Sally and Charles Maio.

■■■ Third, the significant probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. Evidence is unfairly prejudicial only if it has an undue tendency to suggest a decision on an improper basis, such as emotion, sympathy, or horror. *Schurz,* 176 Ariz. at 52, 859 P.2d at 162. We find that this evidence does not have such a tendency.

■■■ The fourth factor requires that, on request, the trial court instruct the jury that they are to consider other act evidence only for the proper purpose for which it was admitted. *Atwood,* 171 Ariz. at 639, 832 P.2d at 656. Here, the defense requested and got such an instruction.[4]

This other act was very close in time to the murder, defendant assaulted the victim in a similar manner (by strangling), and after the assault he told the Maios that he was going to kill Irene. Furthermore, after this assault, Irene obtained an injunction prohibiting harassment by defendant, and defendant made hostile remarks to the police assistant when served with the injunction. The previous assault and defendant's statements after the assault clearly go to premeditation. We conclude that the trial court did not abuse its discretion by admitting the evidence of the previous assault.

### 6. Witness References to Untested Substances as "Blood"

Defendant argued in a motion in limine that the state be precluded from referring to the fingerprint on a Coke can found at the scene as "bloody" because the substance had not been analyzed. The state did not object, and the trial court granted the motion. Instead, witnesses could properly say that these substances "appear[ed] to be blood." However, on three separate occasions, witnesses inadvertently referred to substances as "blood" rather than as "apparent blood."

---

**4.** The trial court instructed the jury as follows: [E]vidence of other bad acts of the Defendant has been admitted into evidence in this case. Such evidence is not to be considered by you to prove the character of a Defendant or to show that he committed the offense charged.

It may, however, be considered by you regarding a Defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
*See* Recommended Arizona Jury Instructions (RAJI), Standard Criminal 26 (1989).

In the first instance, the trial court struck testimony that a business card had a blood stain on it and instructed the jury to disregard the reference to blood. In the second instance, the trial court struck testimony that knives had bloodstains on them, and in the third instance, the trial court sustained an objection to testimony that vertical blinds in the victim's bedroom had blood splatters on them. The trial court denied defendant's motions for a mistrial and for a new trial based on these improper references to blood.

The trial court's denial of a mistrial and motion for a new trial is reviewed under an abuse of discretion standard. *Rankovich*, 159 Ariz. at 121, 765 P.2d at 523; *State v. Simms*, 176 Ariz. 538, 540, 863 P.2d 257, 259 (App.1993). In deciding whether to grant a mistrial based on a witness's testimony, the trial court considers (1) whether the testimony called to the jury's attention matters that it would not have been justified in considering in reaching the verdict, and (2) the probability that the testimony influenced the jury. *Simms*, 176 Ariz. at 541, 863 P.2d at 260.

Here, this testimony does not satisfy either prong of the *Simms* test. The testimony did not bring to the jury's attention matters that it was not justified in considering in reaching the verdict. The state's serologist testified that many substances found at the crime scene and in defendant's apartment were tested for the presence of blood and were found to be blood. The serologist testified that the business card and knives, to which the witnesses had improperly referred earlier in the trial as having bloodstains on them, were tested for blood and did contain blood. Therefore, the only witness referral to blood splatters that was not proved to actually be blood was to the vertical blinds in the victim's bedroom.

This testimony likely did not influence the jury, and we find that the trial court did not abuse its discretion by denying defendant's motion for a mistrial. We find that the

improper reference or references to "blood" did not deny defendant a fair trial.

### 7. Failure to Disclose Inconsistent Statement of Witness, Pursuant to Rule 15.1(a)(7), Arizona Rules of Criminal Procedure

Sally Maio testified that defendant telephoned her from jail after his arrest and told her that Irene's death had been an accident, that "he was going to plead insanity and drag this thing out as long as he possibly could," and that "he was going to get off by insanity."

After Sally Maio testified, defense counsel claimed he was surprised by her testimony. The prosecutor stipulated that Ms. Maio advised him of defendant's statement that he "was going to get off by insanity" only immediately before she testified. The trial court allowed defendant to play a tape-recorded pretrial interview of Ms. Maio to the jury, which had been conducted by both counsel, to illustrate that this statement was inconsistent with what Ms. Maio had previously said defendant told her. During the tape-recorded interview, Ms. Maio said that defendant told her he would beat the charges against him and get out of jail soon.[5]

The defense moved for a mistrial, alleging that the state violated rule 15.1(a)(7) by failing to disclose an inconsistent witness statement, and the trial court denied the motion. Defendant later moved for a new trial based on this failure to disclose, and the trial court also denied that motion.

Defendant claims that if this statement had been disclosed when the state initially learned of it, then the defense could have made a motion in limine. Further, defendant argues that the trial court could have imposed a sanction for this late disclosure by precluding the evidence or providing the defense with another opportunity to speak with this witness. Rule 15.7, Arizona Rules of Criminal Procedure; *State v. Dumaine*, 162 Ariz. 392, 405–06, 783 P.2d 1184, 1197–98 (1989). Defendant argues that this testimo-

---

5. The tape recording does not appear in the record as an exhibit, nor is there a transcription of the interview in the typed transcript. We resolve the issue in this case by a review of counsels' statements on the record and in the briefs filed in this court, which are not in conflict.

ny made it less likely that the jury would accept defendant's insanity defense.

We review the trial court's denial of motions for a mistrial and for a new trial under an abuse of discretion standard. *Rankovich*, 159 Ariz. at 121, 765 P.2d at 523; *Simms*, 176 Ariz. at 540, 863 P.2d at 259.

▮▮▮▮ Defendant has a due process right to timely disclosure of material evidence. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); *Atwood*, 171 Ariz. at 606, 832 P.2d at 623. However, in this case, the prosecutor was not aware of this statement until immediately before Ms. Maio's testimony. Both counsel had previously interviewed this witness, and the trial court allowed defendant to play Ms. Maio's tape-recorded pretrial interview. Furthermore, we agree with the trial court that Ms. Maio's testimony at trial was not inconsistent with what she had stated previously at the tape-recorded interview.

### 8. Prosecutor's Alleged Violation of Rule 9.3, Arizona Rules of Criminal Procedure, by Discussing the Case with State's Witnesses

At trial and before the presentation of testimony, defendant invoked rule 9.3, Arizona Rules of Criminal Procedure, which excludes witnesses from the courtroom prior to testifying and directs witnesses not to communicate with each other until all have testified. *See State v. Sowards*, 99 Ariz. 22, 26, 406 P.2d 202, 204 (1965) (stating that purpose of rule is to encourage discovery of truth and to expose falsehoods). Defendant moved for a new trial, arguing that the prosecutor circumvented this rule by advising 4 witnesses—Elaine Randall, Amy Fitch, Sally Maio, and Charles Maio—that the victim died as a result of numerous stab wounds. Defense counsel stated that he learned this when interviewing these witnesses after trial, but he did not specify whether the prosecutor conveyed this information to the witnesses jointly or separately or whether it was before or during the trial. Defendant argues that because the evidence of Irene's stabbing was presented at trial during the pathologist's testimony, the prosecutor shared testimony of another witness with witnesses who

had not yet testified, in violation of rule 9.3. The trial court denied the motion for new trial.

Defendant contends that the prosecutor's purpose in relating these facts to the witnesses was to prejudice the witnesses against him. Defendant argues that this strategy denied him a fair trial and impacted his right to confront the witnesses against him, in violation of the Sixth Amendment of the United States Constitution and article 2, § 24 of the Arizona Constitution. *See, e.g., Dumaine*, 162 Ariz. at 400, 783 P.2d at 1192 (holding no violation of right to present witness where prosecutor advised state's witness of penalties for testifying falsely); *State ex rel. Romley v. Superior Court*, 172 Ariz. 232, 240, 836 P.2d 445, 453 (App.1992) (holding that defendant's right to confront witnesses includes the ability effectively to cross-examine state's witnesses).

▮▮▮ Motions for new trial are not favored, and the trial court's denial of a motion for new trial will not be disturbed absent an abuse of discretion. *Rankovich*, 159 Ariz. at 121, 765 P.2d at 523.

▮▮▮ Rule 9.3 states that witnesses shall "not [ ] communicate *with each other* until all have testified." (Emphasis added.) If defendant shows that a witness violated this rule, then admission of that witness's testimony is within the trial court's discretion. Reversal on appeal is proper only where defendant shows an abuse of discretion by the trial court and resulting prejudice to defendant. *State v. Perkins*, 141 Ariz. 278, 294, 686 P.2d 1248, 1264 (1984). In *Perkins*, the court found a violation of rule 9.3. 141 Ariz. at 294, 686 P.2d at 1264. In that case, the prosecutor discussed the case jointly with two witnesses, but the court found that the trial court had not abused its discretion by allowing the witnesses to testify and that the defendant had not been prejudiced. *Perkins*, 141 Ariz. at 294–95, 686 P.2d at 1264–65. In this case, defendant does not allege that the prosecutor talked to the witnesses jointly. Moreover, even if rule 9.3 were violated, defendant must show he was prejudiced, which he has not done. *State v.*

*Hadd,* 127 Ariz. 270, 277, 619 P.2d 1047, 1054 (App.1980).

Furthermore, defendant alleges that the prosecutor talked to these witnesses about the manner of Irene's death, but the testimony of these witnesses involved subjects unrelated to the manner of her death. Elaine Randall was a real estate agent who testified only that she located defendant's apartment for him. Amy Fitch had worked with defendant at a photography business and testified regarding his employment history. Sally and Charles Maio both testified regarding defendant's previous assault on Irene.

Finally, we find no evidence in this case that the prosecutor coerced or intimidated the witnesses, induced the witnesses to testify falsely, or shared information with the witnesses so their stories would "gel." *See* A.R.S. § 13–2802 (influencing a witness); Ethical Rule (ER) 3.4(b), Arizona Rules of Professional Conduct; *Dumaine,* 162 Ariz. at 399–400, 783 P.2d at 1191–92; *Perkins,* 141 Ariz. at 294, 686 P.2d at 1264. Indeed, the record does not even support defendant's allegation that the prosecutor talked to the witnesses.

### 9. Lack of On-the-Record Inquiry as to the Waiver of Defendant's Right to Testify

Before trial, the defense listed defendant as a possible witness. Defendant did not testify at the trial; however, he made a statement at the presentence aggravation/mitigation hearing. In his statement to the trial court, defendant said he wanted to testify at the trial, but his lawyer told him it was too late. His defense attorney commented later at the hearing that defendant chose not to testify and that he did not tell defendant he could not testify or that it was too late to testify.

Defendant argues that the trial court had a *sua sponte* duty to make an on-the-record inquiry into waiver of his right to testify, and that his conviction should be reversed because he did not affirmatively waive his right to testify, as guaranteed under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, the Confrontation Clause, and article 2, § 24 of the Arizona

Constitution. *See LaVigne v. State,* 812 P.2d 217, 222 (Alaska 1991) (requiring on-the-record waiver of right to testify in future cases). *But see State v. Allie,* 147 Ariz. 320, 328, 710 P.2d 430, 438 (1985).

■ The United States Supreme Court has held that a defendant has a fundamental right, guaranteed under the Constitution, to testify. *Rock v. Arkansas,* 483 U.S. 44, 53 n. 10, 107 S.Ct. 2704, 2710 n. 10, 97 L.Ed.2d 37 (1987); *see also State v. Tillery,* 107 Ariz. 34, 37, 481 P.2d 271, 274 (1971). However, the Supreme Court has not stated whether the defendant must make a knowing, intelligent, and voluntary waiver of this right. *Cf. Johnson v. Zerbst,* 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (holding that fundamental right to counsel requires trial judge to determine whether defendant has made "an intelligent and competent waiver"). Mechanisms are currently present to ensure a defendant's knowing, intelligent, and voluntary waiver of other fundamental rights. *See, e.g.,* rule 6.1(c) & Form 8, Arizona Rules of Criminal Procedure (waiver of right to counsel); rule 17.1(b) & Form 18 (waiver of right to present a defense when defendant pleads guilty); rule 18.1(b) & Form 20 (waiver of right to jury trial).

State courts have differed as to whether the trial judge must affirmatively determine that a defendant is aware of and wishes to relinquish the right to testify. *Compare LaVigne,* 812 P.2d at 222 (requiring on-the-record waiver) *and People v. Curtis,* 681 P.2d 504, 514 (Colo.1984) (holding that trial judge must ascertain competent waiver by defendant) *and State v. Neuman,* 371 S.E.2d 77, 81–82 (W.Va.1988) (requiring trial judge to advise defendant of right to testify and stating that valid waiver cannot be presumed from silent record) *with Siciliano v. Vose,* 834 F.2d 29, 30 (1st Cir.1987) (finding no constitutional requirement that state court trial judge must inform defendant of right to testify and that such an inquiry might inappropriately influence defendant to waive his right not to testify) *and Allie,* 147 Ariz. at 328, 710 P.2d at 438 (presuming waiver based on defendant's failure to testify) *and Aragon v. State,* 114 Idaho 758, 760 P.2d 1174, 1179

(1988) (requiring on-the-record waiver might provoke judicial participation that could interfere with defense counsel's trial strategy).

 This court has stated that a defendant must make his desire to testify known at trial and cannot allege this desire as an afterthought. *See State v. Martin*, 102 Ariz. 142, 147, 426 P.2d 639, 644 (1967). In *Allie*, the court held that a *sua sponte* inquiry by the trial court regarding a defendant's right to testify is neither necessary nor appropriate. 147 Ariz. at 328, 710 P.2d at 438.

 Although we think that in an appropriate case it may be prudent for a trial court to have a defendant make an on-the-record waiver of the right to testify, see *Martin*, 102 Ariz. at 145, 426 P.2d at 642, it is not generally required under Arizona law. We conclude that defendant was not denied his right to testify and is not entitled to a new trial based on the failure to make an on-the-record waiver.

### 10. Failure to Prove Premeditation Beyond a Reasonable Doubt

Defendant argues that the verdict of premeditated first-degree murder was against the weight of the evidence, and therefore he is entitled to a new trial for second-degree murder or manslaughter. *See State v. Lacquey*, 117 Ariz. 231, 233–34, 571 P.2d 1027, 1029–30 (1977). The trial court instructed the jury on first-degree murder, second-degree murder, and manslaughter. As we stated earlier, defendant presented at trial the defenses of insanity and lack of intent.

Defendant alleges that he does not remember killing Irene, that he was experiencing a "dissociative episode," and therefore he was not acting consciously. Further, he argues that he was suffering from a personality disorder that impaired his impulse control abilities. He claims that although impulsivity may not rise to the level of legal insanity, it bears on the finding of premeditation. *State v. Christensen*, 129 Ariz. 32, 35, 628 P.2d 580, 583 (1981). Furthermore, he argues that he suffers from bipolar disorder, also known as manic depressive psychosis, which impairs his ability to deal with stressful situations.

 When deciding whether the evidence was sufficient to prove premeditation, this court does not reweigh the evidence, but rather views it in the light most favorable to sustaining the conviction, resolving all reasonable inferences against defendant. *State v. Kreps*, 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985). The test applied is whether substantial evidence supports a guilty verdict; the court does not substitute its judgment for that of the jury. *Kreps*, 146 Ariz. at 449, 706 P.2d at 1216. To establish that defendant premeditated the murder, the state must prove that defendant made a decision to kill before committing the act. *Kreps*, 146 Ariz. at 448–49, 706 P.2d at 1215–16. "The necessary premeditation, however, may be as instantaneous as successive thoughts of the mind...." *Kreps*, 146 Ariz. at 449, 706 P.2d at 1216.

 The state presented overwhelming evidence of premeditation. The testimony of the mental health experts belies the claim that defendant was suffering from a disorder that prevented him from premeditating the murder. Dr. Don testified that defendant suffered no mental disorder at the time of the murder, knew what he was doing, and knew that it was wrong. He testified that, even if defendant does not remember now what he did, it does not mean that defendant did not know what he was doing when he did it. Dr. Scialli testified that defendant did not suffer from bipolar disorder at the time of the murder and that defendant's actions were not inconsistent with premeditation.

Other evidence also supports the jury's conclusion that defendant premeditated. In particular, (1) defendant assaulted Irene one month before the murder and threatened to kill her; (2) defendant wore all black clothes the night of the murder; and (3) the murder itself was protracted, brutal, and involved a sustained attack on the victim. We find substantial evidence of premeditation to support the jury's verdict of first-degree murder.

### B. *Sentencing Issues*

### 1. Statements by the Victim's Family Regarding Their Opinions as to the Appropriate Sentence

After the aggravation/mitigation hearing, at the separate sentencing hearing, the vic-

tim's father stated: "I don't think [defendant] should walk the streets again or stay in jail. He should be executed as promptly as possible." Irene's daughter, Jennifer, stated: "I don't want today—him to live.... I don't want the State to have to pay for him to live. I think that's ridiculous to keep a murderer alive." The presentence report contained a statement by Jennifer that she "would like to see him get the death penalty." Irene's cousin wrote a letter, which was also submitted to the trial court as part of the presentence report, stating: "Morality demands that he will never be let loose upon society.... Friends and family feel he doesn't deserve to live. He should suffer as Irene did.... Please provide a sentence that assures his antisocial, violent, amoral behavior can never again be directed against others."

Defendant argues that such statements are irrelevant to a capital sentencing decision, and that admission of such statements creates a constitutionally unacceptable risk of an arbitrary sentence, in violation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution against cruel and unusual punishment. *See Payne v. Tennessee*, 501 U.S. 808, 830 n. 2, 111 S.Ct. 2597, 2611 n. 2, 115 L.Ed.2d 720 (1991); *Booth v. Maryland*, 482 U.S. 496, 503–07, 107 S.Ct. 2529, 2533–35, 96 L.Ed.2d 440 (1987).

■ In *Payne*, the Supreme Court partially overruled *Booth* and held that the Eighth Amendment does not prevent juries in capital cases from hearing evidence and arguments regarding the victim and the impact of the murder on the victim's family. *Payne*, 501 U.S. at 827, 111 S.Ct. at 2609. Such information can be relevant to show a defendant's blameworthiness. *Payne*, 501 U.S. at 825, 111 S.Ct. at 2608. However, the Supreme Court did not address its holding in *Booth* that in capital cases "admission of a victim's family members' characterizations and opinions of the crime, the defendant, and the appropriate sentence violates the Eighth Amendment," because that issue was not before the Court. *Payne*, 501 U.S. at 830 n. 2, 111 S.Ct. at 2611 n. 2.

■ In capital cases, the trial court can give aggravating weight only to evidence that

tends to establish an aggravating circumstance enumerated in A.R.S. § 13–703(F), and victim impact evidence does not have that tendency. *Atwood*, 171 Ariz. at 656–57, 832 P.2d at 673–74; *see also State v. Bolton*, 182 Ariz. 290, 316, 896 P.2d 830, 856 (1995). The Victims' Bill of Rights of the Arizona Constitution, however, guarantees victims of crime the right "[t]o be heard at ... sentencing." Ariz. Const. art. 2, § 2.1(A)(4). Here, the victim's family made statements at the sentencing hearing and in letters and statements attached to the presentence report.

■ In past cases we generally have assumed that trial judges are capable of focusing on the relevant sentencing factors and ignore any "irrelevant, inflammatory, and emotional" statements when making the sentencing decision. *Bolton*, 182 Ariz. at 316, 896 P.2d at 856; *State v. Greenway*, 170 Ariz. 155, 163, 823 P.2d 22, 30 (1991); *State v. Beaty*, 158 Ariz. 232, 244, 762 P.2d 519, 531 (1988). We will do so again in this case because nothing in the record indicates that the trial judge gave weight to the victims' statements. *See* discussion *infra* part III. B.2.

### 2. Joint Sentencing Hearing on Non-capital and Capital Offenses

Defendant argues that by holding the sentencing hearing on both the capital and non-capital offenses together, the trial court heard inadmissible and prejudicial information. Defendant claims that this procedure violated his right to due process and to a fair and reliable sentence under the Eighth and Fourteenth Amendments of the United States Constitution and article 2, §§ 1, 4, 15, and 24 of the Arizona Constitution.

■ Presentence reports are not *per se* inadmissible in capital sentencings. *See* A.R.S. § 13–703(C) (stating that in the sentencing hearing, the court shall disclose to defendant all material contained in presentence report); *State v. Stokley*, 182 Ariz. 505, 519, 898 P.2d 454, 468 (1995). In *Greenway*, the trial judge considered a presentence report for both the murder and non-murder convictions. The court presumed that the trial judge ignored the statements in the

presentence report that were not admissible for the murder conviction when determining whether to impose the death penalty. *Greenway,* 170 Ariz. at 162–63, 823 P.2d at 29–30; *see also Stokley,* 182 Ariz. at 519, 898 P.2d at 468 (disapproving practice of withholding presentence report from trial court and noting that "trial judges know that, on the capital counts, they are limited to statutory aggravating factors properly admitted and proved beyond a reasonable doubt. They may not consider other evidence as aggravating." (citations omitted)).

Defendant does not claim that he had no knowledge of what was in the presentence report, nor does he specify what, if any, evidence was contained in the presentence report that was not admissible for consideration of the death penalty. Furthermore, the trial court stated that its findings in aggravation/mitigation were based "solely upon the statutory requirements of the evidence presented at trial and the evidence presented at the [A.R.S. § 13–703] hearing." This statement is sufficient to establish that the trial court did not rely on the presentence report, and accordingly we find no error. *See Greenway,* 170 Ariz. at 163, 823 P.2d at 30.

### 3. Propriety of Death Penalty

In death penalty cases, this court independently reviews aggravating and mitigating circumstances to determine whether the death penalty was properly imposed. *State v. Milke,* 177 Ariz. 118, 128, 865 P.2d 779, 789 (1993), *cert. denied,* — U.S. ——, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994). Accordingly, we have reviewed the entire record and considered all of the aggravating and mitigating evidence presented. We have independently weighed the aggravating and mitigating circumstances in deciding whether mitigating circumstances are sufficiently substantial to call for leniency. *State v. Brewer,* 170 Ariz. 486, 500, 826 P.2d 783, 797 (1992).

#### a. Aggravating Circumstances

The state must prove beyond a reasonable doubt at least one statutory aggravating circumstance to make defendant death eligible. A.R.S. § 13–703(E). Here, the tri-

al court found the (F)(6) aggravating circumstance, based on a finding of especially heinous or depraved. Heinousness and depravity "focus on the defendant's mental state and attitude as reflected by his words or actions." *Brewer,* 170 Ariz. at 502, 826 P.2d at 799. The trial court found the following factors supported the finding of especially heinous or depraved: (1) relishing of the murder, (2) gratuitous violence, and (3) helplessness of the victim. *See State v. Gretzler,* 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983) (listing 5 circumstances, referred to as the "*Gretzler* factors," that can establish especially heinous or depraved circumstance).

In the special verdict, the trial judge first reviewed the evidence presented at trial and then listed the above factors as establishing the (F)(6) aggravating circumstance. However, defendant complains that the trial judge did not link the evidence with the factors by saying specifically what evidence supported which *Gretzler* factor. Defendant argues this lack of specificity prevents meaningful appellate review. *See Gregg v. Georgia,* 428 U.S. 153, 195, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976). We find that the special verdict is specific enough to allow for meaningful review of the sentence.

We begin our analysis of the three *Gretzler* factors found by the trial court by noting that a finding of senselessness or helplessness alone will not usually support a finding of especially heinous or depraved. *See Gretzler,* 135 Ariz. at 52–53, 659 P.2d at 11–12. However, a finding of helplessness along with a finding of one of the other three *Gretzler* factors—relishing the murder, gratuitous violence, or mutilation of the victim—will usually support a finding of especially heinous or depraved. *Brewer,* 170 Ariz. at 502, 826 P.2d at 799. Based on the following analysis, we conclude that the trial court properly found the (F)(6) circumstance of especially heinous or depraved based on the finding of two *Gretzler* factors: gratuitous violence and helplessness of the victim. We find that the trial court improperly found that defendant relished the murder, but that the other two *Gretzler* factors he did find are

sufficient to uphold the finding of the (F)(6) circumstance.

■ Because the words in the statute "especially heinous, cruel or depraved" are stated in the disjunctive, a finding of heinous or depraved will prove the (F)(6) aggravating circumstance. *See State v. West*, 176 Ariz. 432, 448, 862 P.2d 192, 208 (1993), *cert. denied*, — U.S. —, 114 S.Ct. 1635, 128 L.Ed.2d 358 (1994). The trial court found that the state failed to prove beyond a reasonable doubt that the murder was especially cruel.

### i. *Relishing the murder*

■ In the special verdict, the trial court noted that defendant was observed gambling in Laughlin the day after the murder. Defendant lost between $1,100 and $1,200 gambling, which may have been money that he stole from Irene. The pit boss at the casino agreed with defense counsel that defendant was "quiet and not doing anything out of the ordinary" when he was gambling.

There is no evidence that defendant bragged about the crime. *Cf. West*, 176 Ariz. at 448, 862 P.2d at 208 (bragging about beating up "some old man"); *State v. Runningeagle*, 176 Ariz. 59, 65, 859 P.2d 169, 175, *cert. denied*, — U.S. —, 114 S.Ct. 609, 126 L.Ed.2d 574 (1993) (laughing after murder and bragging about "good fight"). The day after the murder, defendant called his mother and told her: "[H]e thought he had done a terrible thing. He thought he had killed Irene.... [H]e was going to kill himself."

Although the fact that defendant gambled soon after killing Irene reflects a certain amount of callousness, it does not prove beyond a reasonable doubt that defendant relished the murder. Furthermore, there is no compelling proof that the money he lost gambling was Irene's. Therefore, we find that the state did not prove beyond a reasonable doubt that defendant relished the murder.

### ii. *Gratuitous violence*

■ Gratuitous violence, as that term is used in making a finding of especially heinous or depraved, is violence in excess of that necessary to commit the crime. *See, e.g.,*

*State v. Hinchey*, 165 Ariz. 432, 439, 799 P.2d 352, 359 (1990) (finding especially heinous or depraved circumstance where defendant used more force than necessary to kill victim by using multiple instruments to inflict wounds). Defendant argues that the mere fact that the victim suffered multiple wounds does not establish a heinous or depraved state of mind, but instead shows that defendant was out of control. *See Hinchey*, 165 Ariz. at 441–42, 799 P.2d at 361–62 (Kleinschmidt, J., dissenting).

■ In the special verdict, the trial court characterized the murder "as a brutally savage attack of shocking proportions." Defendant apparently used numerous instruments to inflict injury to Irene: namely, several knives, scissors, and a wooden salad fork. *See State v. Wallace*, 151 Ariz. 362, 367–68, 728 P.2d 232, 237–38 (1986) (defendant's use of several instruments when less violent alternatives available to accomplish murder constitutes heinous or depraved state of mind). Irene suffered 34 stab wounds and slicing wounds, puncture wounds, and many blunt force injuries. Her nose was broken, and there was evidence that defendant had kicked or stomped on her. There was compelling evidence that defendant had strangled Irene, and the autopsy revealed that she died from asphyxiation and multiple stab wounds. We conclude that these facts prove beyond a reasonable doubt that defendant inflicted gratuitous violence on the victim, and this shows an especially heinous or depraved state of mind. *See Brewer*, 170 Ariz. at 502–03, 826 P.2d at 799–800; *Hinchey*, 165 Ariz. at 439, 799 P.2d at 359.

### iii. *Helplessness of victim*

Evidence presented at trial indicates that a protracted struggle occurred between defendant and the victim. Defendant argues that this fact implies that the victim resisted and was not helpless. He further argues that it is inconsistent to have a finding of both gratuitous violence resulting from the struggle and helplessness of the victim at the end of the struggle. *But see Brewer*, 170 Ariz. at 502–03, 826 P.2d at 799–800. Defendant contends that helplessness, as interpreted by the trial court in this case, would apply to every

murder case, thus violating the mandate that aggravating circumstances must provide a narrowing function and must distinguish "the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Godfrey v. Georgia,* 446 U.S. 420, 427–29, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980), quoting *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972). Defendant concludes that the "helplessness" factor, as interpreted by the trial court in this case, is unconstitutional. *See* U.S. Const. amends. 8, 14; Ariz. Const. art. 2, §§ 4, 15.

The United States Supreme Court has held that the construction by the Arizona Supreme Court of the (F)(6) aggravating circumstance is not unconstitutionally vague. *Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 3057, 111 L.Ed.2d 511 (1990); *see also State v. Amaya–Ruiz,* 166 Ariz. 152, 176, 800 P.2d 1260, 1284 (1990). Evidence of a protracted struggle does not negate the finding of helplessness. For example, in *Brewer,* the court held that the victim was helpless, despite her apparent ability to initially resist the assault in a violent and protracted struggle. 170 Ariz. at 502, 826 P.2d at 799. Here, defendant ultimately rendered Irene helpless by binding her. We conclude that the trial court properly found the victim's helplessness was proven beyond a reasonable doubt.

### b. Mitigating Circumstances

[50, 51] The sentencing judge must consider all relevant evidence offered in mitigation, but the weight to be given such evidence is within the judge's discretion. *State v. Ramirez,* 178 Ariz. 116, 131, 871 P.2d 237, 252, *cert. denied,* — U.S. —, 115 S.Ct. 435, 130 L.Ed.2d 347 (1994); *State v. Fierro,* 166 Ariz. 539, 551, 804 P.2d 72, 84 (1990). The sentencing judge must consider "any aspect of the defendant's character or record and any circumstance of the offense relevant to determining whether the death penalty should be imposed." *State v. Kiles,* 175 Ariz. 358, 373, 857 P.2d 1212, 1227 (1993) (internal quotations omitted), *cert. denied,* — U.S. —, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994); *see also State v. Gallegos,* 178 Ariz. 1, 23, 870 P.2d 1097, 1119, *cert. denied,* — U.S. —, 115 S.Ct. 330, 130 L.Ed.2d 289 (1994). Defendant must prove mitigating circumstances by a preponderance of the evidence. *Greenway,* 170 Ariz. at 168, 823 P.2d at 35.

Based on our independent review, we find no statutory mitigating circumstances exist. We find the following non-statutory mitigating circumstances: defendant (1) was under unusual stress, (2) has character or behavior disorders, (3) experienced physical and emotional abuse from ages 4 to 12, and (4) has demonstrated good character while incarcerated. However, the non-statutory mitigating circumstances are not substantial enough to call for leniency.

### i. *Statutory Mitigating Circumstance (G)(1)*

The trial court considered the evidence presented regarding defendant's mental health but found he had not proved by a preponderance of the evidence the (G)(1) statutory mitigating circumstance.[6] The testimony of the state's expert witnesses on the issue of defendant's mental health supports the trial court's finding that the (G)(1) circumstance was not established. Dr. Don and Dr. Scialli both testified that defendant appreciated the nature of his acts and could conform his conduct to the requirements of the law. Defendant did prove that he suffers from behavioral disorders that may have affected his conduct when he committed the murder. We agree with the trial court that this evidence supported the finding of a non-statutory mitigating circumstance, as discussed below, but not the (G)(1) circumstance.

---

6. Section 13–703(G) states:
 Mitigating circumstances shall be any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including ...: 1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.

## 70

### ii. *Statutory Mitigating Circumstance (G)(2)*

 The trial court was unclear in its special verdict regarding whether it found the (G)(2) statutory mitigating circumstance that "defendant was under unusual and substantial *duress,* although not such as to constitute a defense to prosecution." (Emphasis added.) The special verdict states:

> As to statutory mitigating circumstance (G)(2), the defendant has not asserted that he was under unusual or substantial *duress.* The Defendant has, however, alleged that he was under unusual *stress. . . .* THE COURT FINDS the Defendant *has* proved by a preponderance of the evidence that this was present.

(Emphasis in original.) This paragraph is in the section of the special verdict titled, "Mitigation—Statutory." We conclude that the trial court did not find the (G)(2) mitigating circumstance, but did find a non-statutory mitigating circumstance that defendant was under unusual stress.

 Defendant did not present evidence that he was under duress when he committed the crime, but he did present evidence that he was under significant stress before the crime. Shortly before the murder, defendant was not eating or sleeping, he lost weight, and he often paced the floor. Defendant's mother was concerned about his mental health and tried to get him into treatment. Testimony was also presented that defendant was depressed at the time of the murder. Defendant's mental health expert testified that defendant might act reflexively if under stress. Witnesses also testified regarding defendant's prior history of mental illness and psychiatric treatment.

Because substantial evidence was presented from several witnesses that defendant was under stress and that his mental state was deteriorating at or near the time of the murder, we find that the trial court was correct in finding defendant's unusual stress as a non-statutory mitigating circumstance.

### iii. *Non-Statutory Mitigating Circumstances*

The trial court found the following non-statutory mitigating circumstances, which we find were supported by the evidence in the record: (1) character or behavior disorders, (2) physical and emotional abuse from the ages of 4 to 12, and (3) good character while incarcerated. Defendant argues that the trial court should have found the following non-statutory mitigating circumstances, which the trial court declined to find: (1) ability to be rehabilitated, (2) close-knit and supportive family, and (3) remorse. The trial court stated that defendant had proved he had a supportive family but that this was not relevant mitigating evidence. The trial court did not discuss remorse in the special verdict.

 Defendant presented no evidence regarding his ability to be rehabilitated in an institutional setting; therefore, we agree with the trial court's finding that ability to be rehabilitated was not proven by a preponderance of the evidence.

 On appeal, defendant argues that remorse is a non-statutory mitigating circumstance; however, he did not allege remorse as a circumstance to the trial court. Based on our independent review of the record, we find that defendant has not proved remorse by a preponderance of the evidence. Defendant called his mother the day after the murder, threatened to commit suicide, and said "he thought he had done a terrible thing. He thought he had killed Irene." At the aggravation/mitigation hearing, he said he would "gladly and willingly accept [his] fate," and he was "devastatingly sorry." Defendant stated that Irene did not deserve to die; he had no plan or wish to kill her.

On the other hand, in defendant's statements to the court before sentencing and at the aggravation/mitigation hearing, he maintained that this was not a first-degree murder. Defendant characterized the trial as a "mockery of the judicial system." Defendant made similar statements to the probation officer, which were made a part of the presentence report. We note that defendant eluded the police by fleeing the scene of the crime and going to Laughlin, Nevada, and then to Montana. Furthermore, in his statements to the court, defendant continued to deny responsibility for his acts, claiming he

did not remember committing the murder and that he did not understand how the murder happened.

In *State v. Wallace*, the defendant called the police after the murders, was emotionally distraught, refused to cooperate with counsel because he did not want to present a defense, and pled guilty to the murders. 151 Ariz. 362, 364–65, 728 P.2d 232, 234–35 (1986). The trial court found as a mitigating circumstance that the defendant was "genuinely remorseful" but that defendant's remorse was not sufficiently substantial to call for leniency. *Wallace,* 151 Ariz. at 368, 728 P.2d at 238; *cf. Brewer,* 170 Ariz. at 507, 826 P.2d at 804 (recognizing that remorse may be a mitigating circumstance, but finding it did not exist in that case).

In this case, defendant's showing of remorse was much less convincing than in *Wallace.* Therefore, based on our independent review of the record, we find that defendant did not prove the non-statutory mitigating circumstance of remorse by a preponderance of the evidence.

■ We agree with the trial court's assessment that defendant proved he had a supportive family, but this was not relevant mitigating evidence. At trial and at the sentencing hearing, defendant's mother testified regarding his prior mental problems and family background. She testified at trial that she had been trying to get him into mental health treatment before the murder because she was concerned about his mental condition. In addition, defendant's sisters testified at trial in his behalf. Despite this positive influence, defendant committed this horrible crime.

Therefore, we conclude that in this case the support of third parties does not translate into a mitigating circumstance for defendant. This evidence is not relevant to whether defendant should receive the death penalty.

#### c. Reweighing

■ We conclude that the trial court erred in finding that defendant relished the murder, although we agree with the finding of the (F)(6) aggravating circumstance based on a finding of gratuitous violence and helplessness of the victim. Therefore, we reweigh the aggravating and mitigating circumstances. *See State v. Bible,* 175 Ariz. 549, 606–09, 858 P.2d 1152, 1209–12 (1993). This case does not require that new evidence be received; the trial court did not improperly exclude mitigating evidence at sentencing, and the mitigating evidence is not of great weight. *See State v. King,* 180 Ariz. 268, 288, 883 P.2d 1024, 1044 (1994). Therefore, this case is appropriate for reweighing by this court rather than remanding to the trial court. *King,* 180 Ariz. at 288, 883 P.2d at 1044.

■ Furthermore, "[i]n weighing, we do not simply count the number of aggravating or mitigating factors. The quality and strength of each must also be considered." *State v. Willoughby,* 181 Ariz. 530, 549, 892 P.2d 1319, 1338 (1995) (citations omitted). In *Willoughby,* the court found only one aggravating circumstance—pecuniary gain—and substantial mitigating evidence. 181 Ariz. at 548–49, 892 P.2d at 1337–38. The court upheld defendant's death sentence, however, because the aggravator was extremely compelling and overshadowed defendant's commendable behavior before committing the murder. *Willoughby,* 181 Ariz. at 549, 892 P.2d at 1338. Similarly, in this case, although we did not find that defendant relished the murder, the finding of gratuitous violence is entitled to great weight. The (F)(6) aggravating circumstance would have even more weight if defendant had relished the murder, but based on gratuitous violence and helplessness, the evidence of defendant's especially heinous or depraved state of mind is convincing. This was a particularly gruesome, brutal, and protracted killing. Defendant physically restrained the victim, stomped on her, stabbed her numerous times, and strangled her.

Therefore, we have independently reweighed the aggravating and mitigating circumstances and considered the cumulative weight of all the mitigating circumstances as we find them and conclude that the death penalty is the appropriate sentence.

#### 4. Constitutionality of the Death Penalty

Defendant argues that the Arizona death penalty statute is unconstitutional as written and applied, based on the following claims. These arguments do not warrant extended discussion because defendant's claims previously have been decided adversely to him or because he states no viable claim.

a. Defendant argues that the death penalty statute, A.R.S. § 13–703, is unconstitutional because the prosecutor has discretion to decide whether to seek the death penalty. We have rejected this argument. *State v. Salazar*, 173 Ariz. 399, 411, 844 P.2d 566, 578 (1992), *cert. denied*, 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993); *State v. Harding*, 137 Ariz. 278, 292, 670 P.2d 383, 397 (1983).

b. Defendant argues that the death penalty statute is unconstitutional because it does not require the state to prove that the death penalty is appropriate. In the sentencing phase, the state has the burden of proving beyond a reasonable doubt the existence of only aggravating circumstances. *State v. Herrera*, 174 Ariz. 387, 397, 850 P.2d 100, 110 (1993); *State v. Brewer*, 170 Ariz. at 500, 826 P.2d at 797. We have rejected the argument that our weighing approach is unconstitutional and have held that "our statute provides constitutionally acceptable standards for deciding whether aggravating circumstances outweigh mitigating factors." *State v. Correll*, 148 Ariz. 468, 484, 715 P.2d 721, 737 (1986); *see also Stokley*, 182 Ariz. at 516, 898 P.2d at 465; *State v. Barreras*, 181 Ariz. 516, 521, 892 P.2d 852, 857 (1995).

c. The fact that defendant has the burden of proving mitigating evidence by a preponderance of the evidence does not make the death penalty statute unconstitutional. *Walton v. Arizona*, 497 U.S. 639, 649–51, 110 S.Ct. 3047, 3055–56, 111 L.Ed.2d 511 (1990). Defendant also argues that, once the state has proven at least one aggravating circumstance, the statute places the burden on a defendant to prove sufficiently substantial mitigation to outweigh the presumption of death. This argument has been rejected. *See Walton*, 497 U.S. at 650, 110 S.Ct. at 3055 (holding that "a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency"); *Bolton*, 182 Ariz. at 310, 896 P.2d at 850 (holding that "it is not unconstitutional to impose the death penalty by statutory mandate if one or more aggravating factors are present and mitigating circumstances are insufficient to warrant leniency").

d. Defendant argues that the death penalty statute is unconstitutional because the trial judge, rather than the jury, determines the sentence. We have rejected this argument. *Correll*, 148 Ariz. at 483–84, 715 P.2d at 736–37. There is no constitutional right to have a jury determine aggravating or mitigating circumstances. *Walton*, 497 U.S. at 647–49, 110 S.Ct. at 3054–55; *State v. Apelt*, 176 Ariz. 369, 373, 861 P.2d 654, 658 (1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 113, 130 L.Ed.2d 59 (1994).

e. Defendant argues that the death penalty statute is overbroad and vague because it does not sufficiently channel sentencing discretion or provide sufficient standards for weighing aggravating and mitigating circumstances. We have rejected this argument. *Salazar*, 173 Ariz. at 411, 844 P.2d at 578; *State v. Greenway*, 170 Ariz. 155, 164, 823 P.2d 22, 31 (1991) (finding that Arizona statute narrowly defines class of death-eligible defendants).

f. Defendant argues that the death penalty statute is unconstitutional because it provides no mechanism by which defendant may explore potential biases or prejudice of the sentencer. We have rejected the argument of a constitutional right to voir dire the sentencing trial judge. *State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987).

g. The (F)(6) aggravating circumstance ("especially heinous, cruel or depraved") is not unconstitutionally vague as construed by this court. *Walton*, 497 U.S. at 655, 110 S.Ct. at 3058; *Salazar*, 173 Ariz. at 411, 844 P.2d at 578.

h. The death penalty does not constitute cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 186–87, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976); *Stokley*,

182 Ariz. at 516, 898 P.2d at 465; *State v. Blazak,* 131 Ariz. 598, 601, 643 P.2d 694, 697 (1982).

i. Proportionality review is not constitutionally required. *Pulley v. Harris,* 465 U.S. 37, 43–44 & n. 6, 104 S.Ct. 871, 875–76 & n. 6, 79 L.Ed.2d 29 (1984); *Salazar,* 173 Ariz. at 416, 844 P.2d at 583.

## IV. DISPOSITION

We have considered all the issues raised by defendant and find that his convictions are proper. We have conducted an independent review of defendant's sentence of death and find that the mitigating circumstances considered cumulatively are not substantial enough to call for leniency. We affirm the trial court's finding of one aggravating circumstance, A.R.S. § 13–703(F)(6), and be-

cause we believe that the death penalty should be imposed, we affirm defendant's death sentence. *See Atwood,* 171 Ariz. at 657, 832 P.2d at 674. We have searched the record for fundamental error pursuant to A.R.S. § 13–4035 and have found none.

We therefore affirm defendant's convictions and sentences.

FELDMAN, C.J., MOELLER, V.C.J., and ZLAKET and MARTONE, JJ., concur.